*In re* ANNA M. CLARK, *Petitioner, on behalf of George W. Clark, her husband, for a writ of habeas corpus.*

No. 17,644.

SYLLABUS BY THE COURT.

1. HABEAS CORPUS—*"Dangerous Insane"—Commitment—Ex Post Facto Law—Constitutional Law.* Section 5 of chapter 299 of the Laws of 1911, providing that a person acquitted of a criminal charge on the ground that he was insane when the offense was committed, shall be committed to the asylum for the dangerous insane, and shall not be liberated therefrom except as prescribed in the act, is not *ex post facto* as to a person tried and acquitted on that ground after the statute was enacted for an offense committed before its passage.

2. —— *Same.* The section referred to in the preceding paragraph is not obnoxious to the provision of the federal constitution that a state shall not deprive any person of due process of law, nor to the provisions of the state constitution that all persons for injuries to person, reputation or property shall have remedy by due course of law.

Original proceeding in habeas corpus. Opinion filed February 10, 1912. Petitioner's husband remanded.

*Edgar Foster,* and *Albert Hoskinson,* for the petitioner.

*John S. Dawson,* attorney-general, for the respondent; *Clad Hamilton, Clay Hamilton,* and *E. R. Thorpe,* of counsel.

The opinion of the court was delivered by

BENSON, J.: On a trial for murder George W. Clark introduced evidence to prove that he was insane when the homicide occurred. The jury found the defendant not guilty because at the time of the commission of the offense he was insane. Thereupon the defendant was committed to the asylum for the dangerous insane for safe-keeping and treatment, and was in that institution when this writ was issued. The contention is that the

statute under which he was committed is *ex post facto* as to Clark; that it is unconstitutional because it deprived him of the right to trial by jury in the probate court of the question of his sanity at the time of commitment, and if insane, of the benefit of admission to a regular hospital for treatment; and that it deprives him of the right to institute proceedings to obtain his discharge and of liberty without due process of law. Section 5 of the statute, which took effect March 17, 1911, reads:

"Whenever during the trial of any person on an indictment, or information, and evidence is introduced to prove that he was insane, an idiot or imbecile or of unsound mind at the time of the commission of the offense and such person shall be found to have been at the date of the offense alleged in said indictment or information, insane, an idiot, or an imbecile, and is acquitted on that ground, the jury or the court, as the case may be, shall so state in the verdict and in said case it shall be the duty of the jury to pass specially on the question of the sanity of the defendant, and the court shall thereupon, forthwith commit such person to the State Asylum for the Dangerous Insane for safe keeping and treatment, and such person shall be received and cared for at said institution. No such person so acquitted shall be liberated therefrom, except upon the order of the court committing him thereto and until the superintendent of the said Asylum for the Dangerous Insane shall certify in writing to such committing court that in his opinion such person is wholly recovered and that no person will be in danger by his discharge." (Laws 1911, ch. 299, § 5.)

The homicide occurred on December 12, 1910, and the trial took place in April, 1911. When the act charged in the information was committed there was no provision for commitment to an asylum for the dangerous insane, and it is argued that the statute passed afterward authorizing such commitment is *ex post facto*. There were, of course, at that time other provisions of law providing for the restraint of insane

*In re* Clark.

persons and their treatment in institutions provided for the purpose. The commitment is not for punishment, but for the restraint and treatment of insane persons. (*The State v. Linderholm*, 84 Kan. 603, 114 Pac. 857; *State, ex rel. Thompson, v. Snell*, 49 Wash. 177, 181, 94 Pac. 926.)   The term *"ex post facto,"* as used in the constitution, relates to criminal punishment and has no relation to other retrospective laws. (Cooley, Const. Lim., 6th ed., p. 318; *Meffert v. Medical Board*, 66 Kan. 710, 72 Pac. 247.)   The statute merely provides a new procedure for the restraint, care and treatment of a class of the insane.   It would be strange if the legislature could not change the procedure affecting insane people, or if such new procedure could not relate to persons thus afflicted before the passage of an act authorizing the inquiry.   The state also has the undoubted right to classify the insane for treatment, and this is constantly done in ordinary asylums.   Certainly those who are dangerous may be segregated in a separate building as well as in a separate ward.

It is contended that the act by its terms authorizes the deprivation of liberty without due process of law; first, because there is no provision for finding whether an accused person is insane at the time of his trial on the criminal charge, and second, because he has no power to commence proceedings for release when restored to reason.   While an orderly proceeding adapted to the nature of the case is essential, inquests called in cases of alleged insanity, such as are ordinarily provided by the statutes of various states and by laws of our state, are sufficient.   (Gen. Stat. 1909, §§ 4819-4854, 8464-8470.)   A jury trial is not necessary, although the tribunal provided for the purpose may be called a jury and the inquest designated a trial.   (*The State v. Linderholm*, 84 Kan. 603, 114 Pac. 857; *In re Latta, Petitioner*, 43 Kan. 533, 23 Pac. 655; *Dowdell, Petitioner*, 169 Mass. 387, 47 N. E. 1033, 61 Am. St. Rep.

290, and note, 293; Note 13 A. & E. Ann. Cas. 877; Note, 1 A. & E. Ann. Cas. 733.)

The same well-established rule applies in cases where delinquent children are committed to industrial schools. (*Petition of Ferrier,* 103 Ill. 367.)

"Legislation is not open to the charge of depriving one of his rights without due process of law if it be general in its operation upon the subjects to which it relates, and is enforceable in the usual modes established in the administration of government with respect to kindred matters; that is, by process or proceedings adapted to the nature of the case." (*Dent v. West Virginia,* 129 U. S. 114, 124.)

The confinement of persons acquitted of crime by reason of insanity is a matter of common statutory regulation in this country. (Note, 1 L. R. A., n. s., 540.)

It is said in the note last cited:

"The right to confine one who is still insane, and who is dangerous to the public peace and safety, until such time as he can be released with safety, providing that the present existence of such insanity or dangerous condition is properly shown, has apparently never been questioned; and it would seem that no objection thereto could be successfully raised." (p. 540.)

Questions arising under such statutes relating to the present existence of insanity, and how that fact should be determined, have afforded occasion for much judicial consideration. A statute of Washington contains this provision:

"When any person indicted or informed against for an offense shall, on trial, be acquitted by reason of insanity, the jury, in giving their verdict of not guilty, shall state that it was given for such cause; and thereupon, if the discharge or going at large of such insane person shall be considered by the court manifestly dangerous to the peace and safety of the community, the court may order him to be committed to prison, or may give him into the care of his friends, if they shall give bonds, with surety to the satisfaction of the court,

conditioned that he shall be well and securely kept; otherwise he shall be discharged." (2 Ballin. Anno. Codes & Stat. of Wash. § 6959.)

In *In re Brown,* 39 Wash. 160, 81 Pac. 552, 1 L. R. A., n. s., 540, it was contended that the statute was void for the reasons urged here. The court said:

"Has the petitioner been deprived of due process of law in the premises? He was tried before a jury, to whom he himself submitted the issue that he was insane when the crime was committed. He was permitted to fully introduce his evidence upon that subject, and the jury were instructed as to their duty in the premises. The verdict returned was in his favor upon the issue which he tendered, and he was therefore accorded due process of law and the right of trial by jury upon that subject." (p. 164.)

The opinion referred to the presumption that general insanity once shown to exist still continues, and held that the burden was upon the accused person to show that he was sane at the time of the trial, which he neither alleged nor proved but demanded his discharge as a matter of right, which was denied, and the act was held valid. A later application in *habeas corpus* proceedings in behalf of the same prisoner was made to a federal court, which also held that the act was valid— that while it provided no procedure for trying the issue of insanity at the time of the commitment, the court had the inherent right to cause an arraignment and to give a hearing upon the question in an ordinary course of practice; still, because that was not done his discharge was ordered. (*Brown v. Urquhart,* 139 Fed. 846.) This judgment of the federal court was, however, reversed in *Urquhart v. Brown,* 205 U. S. 179, but without expressing any opinion on the constitutionality of the act.

In a later case the supreme court of the same state held that a statute providing for inquiry concerning persons alleged to be insane and their commitment to a hospital had no application to persons acquitted of

crime on the ground of insanity. The court, reaffirming the constitutionality of the statute relating to such persons, said:

"The question is suggested as to what evidence establishes his 'manifestly dangerous' condition. The fact of his having killed a human being is conclusive that he was 'dangerous'; and the verdict of the jury that he was insane at the time of the homicide; and, unless there is clear, ample and conclusive evidence that his mental condition has undergone a radical change toward a normal condition since that time, the trial judge should not hesitate to find him 'manifestly dangerous,' within the meaning of the statute." (*State, ex rel. Thompson, v. Snell,* 46 Wash. 327, 333, 89 Pac. 931, 9 L. R. A., n. s., 1191.)

The courts of New York have given much consideration to a statute of that state somewhat similar to our own on this subject, and designed to accomplish the same end, in the various Thaw cases. Thaw was committed to a hospital for the criminal insane in pursuance to a provision of the New York criminal code, as follows:

"When the defense is insanity of the defendant the jury must be instructed, if they acquit him on that ground, to state the fact with their verdict. The court must, thereupon, if the defendant be in custody, and they deem his discharge dangerous to the public peace or safety, order him to be committed to the state lunatic asylum, until he becomes sane." (Cook's Crim. & Penal Codes of N. Y. 1897, Crim. Code, § 454.)

He sought release in *habeas corpus* proceedings. Mr. Justice Jenks, in an opinion upon this application reported in *People, ex rel. Peabody, v. Chanler,* 133 N. Y. Supr. Ct., App. Div., 159, said:

"But as there is no provision for enlightenment of the court in any other manner, it must be that the legislature intended that the court could rest its conclusion upon the evidence given at the trial and the appearance of the defendant thereat. If the defendant's plea was insanity and it had prevailed, it would follow that insanity was litigated at the trial. Although the inquiry

*In re* Clark.

at the trial would be directed to insanity at the time of the commission of the offense, yet the evidence might establish that such insanity had not ceased, but had continued, that it was chronic, that the defendant might then or thereafter, in the very nature of his disease, be subject to recurrences of a state of mind like unto that in him when he committed the alleged crime. And moreover, such evidence might well bear directly upon the condition of the defendant at the time of trial. . . . It can not then be said that a defendant who makes the plea of insanity and seeks to establish it did not have notice under this provision of a hearing that might reveal his condition of insanity at the time of his trial, and a hearing of which the result might be such commitment upon acquittal for insanity, under the said provision of the code of criminal procedure, as was made in this case. . . . Such a commitment is not for the punishment of such a defendant, for there can be no punishment for him who has been acquitted, but it is for protection for the public, made in the exercise of the police power of the state, which permits the restraint of an insane person who at large would be a danger to the peace and safety of the people. . . . 'The right to apply at any time for discharge has been held to reconcile even the absence of hearing in the first instance with the constitutional requirement of due process, and if upon such proceeding the petitioner is found to be insane his detention may be continued.' (Freund, Police Power, § 255.)" (pp. 160-163.)

The opinion of Mr. Justice Jenks also states that by the provision of the code (quoted above) the defendant had notice and a hearing that contemplated the process upon which he was committed, and besides the provisions of express law whereby he could institute proceedings to establish his sanity and secure his release satisfied the constitutional safeguards invoked against the statute. Mr. Justice Rich, in a concurring opinion in the same case, said:

"Upon his trial Thaw had established his insanity at the time the crime was committed. It is presumed to continue until the contrary is shown, which in this

case has not been done. His condition had led to one murder, and it can not be said that the duty devolving upon the court to safeguard the public by the detention of the prisoner under the provisions of section 454 of the Code of Criminal Procedure was improperly exercised; the order was a valid adjudication of his then insanity to an extent rendering his liberty dangerous to the public." (p. 173.)

The court of appeals affirmed the judgment denying the writ upon the opinions of the two justices referred to. (*People, ex rel. Peabody, v. Chanler,* 196 N. Y. 525, 89 N. E. 1109, 25 L. R. A., n. s., 947.)

The grounds upon which the statute was held valid suggested in these opinions may be briefly summarized thus: (1) that insanity of a nature dangerous to others, proved on the trial, was presumed to continue to the time of the commitment; (2) that the commitment was based on evidence showing the continuance of such insane condition; and (3) that the commitment resulting from the express command of the statute, the trial and verdict upon the criminal charge was only an equivalent of proceedings provided to determine the question of insanity in cases not involving a charge of crime.

Doubtless there is merit in each of these views, and each should have weight in upholding a statute, which is not to be set aside unless clearly unconstitutional. If the legislature in framing the law sought to give practical effect to the ordinary presumption referred to which so well accords with ordinary observation and experience, no good reason is perceived why it could not do so, leaving a reasonable opportunity for a future determination of the question whether and when the detention should cease.

A further question remains to be considered. It is earnestly insisted that the right to a remedy by due course of law is denied by this act; that it prevents the subject, or any one acting for him, from instituting proceedings for his release when restored to sanity. The

*In re* Clark.

alleged deprivation rests upon the requirement of a certificate from the superintendent that the person is recovered and is not dangerous, as a condition of release. The same argument was urged in the Thaw case, just referred to. It is stated in the opinion of Mr. Justice Rich that one objection urged to the New York statute was that "it authorizes the commitment of a defendant, acquitted of the crime for which he has been tried, to a state lunatic asylum, and provides no way in which he can be discharged other than one dependent upon the volition of the superintendent of such asylum. . . . The same principles of law are applicable in the one case as in the other, the same objects are accomplished and the same results obtained. If the statute under the provisions of which a lunatic is, by a civil proceeding, temporarily restrained of his liberty, with its prescribed summary procedure, is constitutional—which can not be seriously questioned— the statute under which a person charged with crime, who is acquitted because of insanity at the time the crime was committed, may be summarily deprived of his liberty for the protection of the public while his insanity and dangerous proclivities continue, is constitutional" (p. 168), and quotes from the statute:

"A patient, held upon an order of a court or judge having criminal jurisdiction, in an action or proceeding arising from a criminal offense, may be discharged upon the superintendent's certificate of recovery, approved by any such court or judge." (1 Laws of N. Y. 1908, ch. 261, § 2.)

The opinion, however, appears to hold that this remedy is not exclusive, since it is also said that Thaw was at all times entitled to the writ of *habeas corpus,* and that "upon establishing in such proceeding his then sanity, he was entitled to be discharged." (p. 171.) An examination of our statute (Laws 1911, ch. 299) containing the section 5 first above quoted, discloses a scheme for the care and treatment in the asylum for

the insane persons found in state institutions, not only those in penal institutions who are insane when committed, but those who become insane afterward, and also inmates of hospitals for the insane or epileptic or home for the feeble-minded who have homicidal tendencies, or whose presence is dangerous to other inmates. All these unfortunates thus placed in the asylum for the dangerous insane are under the immediate care of the medical superintendent, and any or all of the superintendents of state hospitals may be called in consultation with him when deemed necessary.

The particular provision for liberation of a person acquitted of a criminal charge because of insanity, and committed under this statute, specifies two conditions, viz., the order of the court issuing the commitment, and the certificate of the superintendent that the person is recovered, and that no one will be in danger by his discharge. This action of the court may be taken upon the application of the person committed or of some one in his behalf. No particular procedure is prescribed, but ordinary methods by which the action of a court is invoked and a judicial investigation carried on in other matters, adapted to the end sought, under the supervision of the court as to notice and hearing, are sufficient. Nor is the certificate of the superintendent a condition precedent to or a necessary accompaniment of the application, but it should be presented so that the court may give it consideration and effect at the hearing. A Massachusetts statute provided that one acquitted of murder or manslaughter by reason of insanity should be committed to a lunatic hospital for life, with the further provision, however, that he might be discharged by the governor and council whenever it appeared that he might be discharged without danger to himself or others. The statute did not require the court to inquire whether the insanity continued at the date of the trial. In an action involv-

*In re* Clark.

ing the question whether the state or a municipality was liable for expenses of the support of a person so committed, who it appeared was sane, the supreme court of that state said:

"The practical effect of the statute of 1873 is to provide that in case of an indictment for homicide, the insanity of the defendant is not a defense which entitles him to an unconditional acquittal, but that he shall be detained in confinement until it appears to the governor and council that he may be discharged and set at large without danger to others. He is not committed to the hospital for the purposes of treatment as a lunatic. He is not held there as other inmates are held; he can not be discharged, as others can be, by the trustees, or by a court upon proof that he is not insane, or, if insane, can be sufficiently provided for by himself or his friends, or the town of his settlement. Pub. Sts. c. 87, § 40. He is confined in the hospital as a place of detention, because his being at large would be dangerous to the peace and safety of the community." (*Gleason v. West Boylston,* 136 Mass. 489, 490.)

While objections to the law such as are made here were not presented or considered, no doubt of its validity was suggested in the opinion. A similar statute of North Carolina provided for like commitment in such cases and that there should be no discharge therefrom unless by an act of the legislature; and ·it was held in *In re Boyett,* 136 N. C. 415, 48 S. E. 789, 1 A. & E. Ann. Cas. 729, that the act was void. The opinion quotes freely from many other cases on this subject, and concludes with the conservative direction that the person so detained be brought into court upon *habeas corpus,* but that the affidavit should show that he is not a dangerous lunatic. From this conclusion it would seem that .in the opinion of that court a dangerous lunatic should not be summarily . placed at liberty notwithstanding the invalidity of the statute under which he was committed.

As an inquest provided by statute to determine charges of insanity may determine that question, and

commitment to a hospital be made thereon without the intervention of a jury, it follows that a proper tribunal provided by law may pass upon the question of his restoration. Under our statute in cases of lunacy generally this may be done by an inquiry in the probate court with or without a jury (Gen. Stat. 1909, § 8466), but the jury referred to here is composed of four triers of the fact who are not really a jury. (Gen. Stat. 1909, § 8470; *The State v. Linderholm,* 84 Kan. 603, 114 Pac. 857.) In that statute it is provided that a written statement of the case must be presented by the superintendent, although it is not provided that a certificate favorable to the claim of the applicant for discharge shall be a positive condition upon which it shall be granted, and in this respect the statute differs from the one under which this commitment was issued. The legislature probably made this distinction to provide an additional safeguard where persons have taken life or otherwise committed offenses punishable as crimes if done by a responsible person. The legislature must have believed that the person qualified for the highly important duty of superintending such an institution, and who is in a position to observe conduct and symptoms, is qualified to determine the condition of mind of an inmate, and will be just to him and the public alike. The practical difficulties in deciding such questions upon the testimony of experts called by the parties and great variance in their opinions are the subject of much comment and criticism, leading to earnest inquiry whether the truth of such an issue ought not to be determined by the aid of disinterested persons appointed to investigate and testify or report. (Report of Committee on Insanity and Criminal Responsibility, Journal of the Am. Inst. of Crim. Law and Criminology, Nov., 1911, p. 521.) The statute is in aid of a judicial proceeding for the determination of a matter in which not only the subject of the inquiry but the public have a profound interest. It is a legislative effort to discover

the truth of a vital issue, not altogether novel, for a statute with essentially the same provisions was enacted by the legislature of Minnesota in 1907. The supreme court of that state has expressed no opinion concerning its validity, although brought to its attention in November, 1911, in *Northfoss v. Welch,* (Minn.) 133 N. W. 82. Northfoss had been committed in 1894 to a hospital for the insane for safe-keeping and treatment, upon an acquittal of a criminal charge because of insanity. The superintendent refused to certify that the petitioner was not dangerous, and habeas corpus proceedings were instituted in a district court, which held that the statute applied and that it was constitutional and refused a discharge. On appeal it was held that the statute was not intended to be retroactive, and that persons committed under a former act should be released according to its provisions rather than those of the later statute, and the constitutional question was not decided.

The state as *parens patriæ* may make provision for the care of those unable to care for themselves, as in the case of insane persons and neglected children. (*Dowdell, Petitioner,* 169 Mass. 387, 47 N. E. 1033.) It was said in *Wares, Petitioner,* 161 Mass. 70, 36 N. E. 586 where a child had been committed to the care of the commissioners of public institutions of Boston, who were also vested with the power of discharge, that:

"The discretionary power given to the board or officers to whose custody the child may be committed to discharge it before the end of the term if the object of the commitment has been accomplished, is to the advantage rather than disadvantage of the parent, and we see no valid objection to bestowing it upon such board or officers. Equally important discretionary powers vested in other boards have been upheld, and similar powers exercised by the trustees of the state industrial and reform schools have never, so far as we are aware, been questioned." (p. 75.)

The decision appears to be based upon the fact that after a proper commitment the right of the party was

concluded when it was decided, after a full and fair hearing by the board, that the object of the commitment had not been accomplished. It was said that the liberty remained to apply for a discharge by habeas corpus if rights are prejudiced by errors of law or wrongful conduct of the board. Construing the provision of our law requiring a certificate as stated in the act as a necessary condition of the discharge, if that opinion is sound the act is not thereby necessarily unconstitutional. The presumption is that the officer will do his duty faithfully, but if the certificate should be corruptly or oppressively withheld the applicant would not be without remedy.

The petition does not allege that Clark is now sane, nor that he is not dangerous, and the claim to release is based solely on the supposed unconstitutionality of the statute; but an immediate release would not necessarily follow even if that view should be adopted. As already noted in the Boyett case in North Carolina, where the law was held void, proof that the person was not a dangerous lunatic was required. And in the Thaw case Mr. Justice Gaynor, who in a strong dissent held the act void, still said that the petitioner should be held for proceedings and commitment under the general insanity law of that state.

Again, it does not follow that the statute in question is wholly void even if the provision requiring the certificate referred to is obnoxious to the constitution. That clause is separable and independent, and there is no reason to believe that the legislature would not have passed the provisions for commitment without the provisions for discharge. (*Turner v. Comm'rs of Woodson Co.*, 27 Kan. 314; *Hardy v. Kingman County*, 65 Kan. 111, 68 Pac. 1078; *Harrod v. Latham*, 77 Kan. 466, 95 Pac. 11.) If the provision for discharge should fail it would leave the person detained any remedy available before its enactment to a sane person held as an inmate of a hospital for the insane.

*In re* Clark.

Having reached the conclusion that so much of the statute as authorized a commitment is valid, it follows that the relief now sought should be refused, whatever views are entertained concerning the particular clause requiring a superintendent's certificate. It seems best, however, now that the matter has been fully presented, to state the views of the court upon the validity of the entire act, which we do, holding that its passage was within the constitutional powers of the legislature. The purposes of the statute are highly beneficent. It gives protection to the public against repetitions of homicides or other acts of irresponsible frenzy or distraction, and affords to the unfortunate persons so committed safe seclusion and humane treatment, which it is the province of the state to give in the exercise of its parental power. The judicial department may not interfere with the legislative conscience, unless there is a clear violation of some provision of the constitution. (*Comm'rs of Linn Co. v. Snyder*, 45 Kan. 636, 26 Pac. 21; *Wulf v. Kansas City*, 77 Kan. 358, 94 Pac. 207.)

*Underwood v. People*, 32 Mich. 1, *Doyle, Petitioner*, 16 R. I. 537, 18 Atl. 159, and other cases are cited as being at variance with the views, or some of the views, herein expressed. These cases and others have been carefully considered, but it is believed that the conclusions reached are in harmony with the best considered precedents and are sustained by the better reasoning.

The petitioner's husband is remanded.

JOHNSTON, C. J. (concurring specially) : I concur in the judgment remanding Clark to custody and in the holding that the law under which he was committed to the asylum for the dangerous insane is valid, but I reach this conclusion on the theory that the legislature intended that a person so committed who has been restored to sanity may be liberated by the proper court, with or without the consent of the superintend-

ent of the asylum. The duty and action required of that officer is in aid of a judicial proceeding for a discharge, but, in my view, it was not intended that his decision should be a substitute for a judicial proceeding, nor that his adverse decision would prevent a judicial inquiry as to the sanity of the inmate. Serious questions might arise if a statute were enacted which provided that a release from custody of one restored to sanity could not be had in a judicial proceeding until the consent of the superintendent of the asylum was obtained, or where application to the judicial department for release depended on the will of a ministerial officer. Under our statute it is the duty of the superintendent to bring his opinion or certificate that there has been a restoration to the attention of the court, but his opinion does not preclude a judicial inquiry nor bind the court when an inquiry is made. There was the requisite authority in the court which committed Clark to the asylum; there was the essential inquiry and finding that he was insane at the time he was committed; and the statute affords him, and any one so restrained, an opportunity to directly apply to a court for discharge on the ground that he is no longer insane. Not having availed himself of this remedy, nor shown a restoration to sanity, he is not entitled to a discharge.