No. 50,960

In Re Application of CARROLL E. NOEL, JR., For Release Pursuant to K.S.A. 1978 Supp. 22-3428a.

(601 P.2d 1152)

Opinion filed October 27, 1979.

*Nick A. Tomasic,* Wyandotte district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Thomas L. Boeding,* assistant Wyandotte district attorney, were with him on the brief for the appellant.

*Robert L. Feldt,* of Great Bend, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

McFARLAND, J.: Carroll E. Noel, Jr., was charged with murder in the first degree for the 1973 slaying of a United States Postmaster in Wyandotte County, Kansas. In 1974 a jury returned its verdict determining Noel was "not guilty because of insanity" and he was duly committed to the State Security Hospital at Larned, Kansas, pursuant to K.S.A. 22-3428. Subsequently, but pursuant to the same statute, Noel was transferred to the Larned State Hospital. In February, 1979, Noel filed an application pursuant to K.S.A. 1978 Supp. 22-3428a for hearing to determine whether or not he continued to be dangerous to himself or others. The district court found Noel "does not pose a danger to himself or others as long as he is on the prescribed medication," and ordered his discharge from the Larned State Hospital. As a condition of the discharge Noel was ordered transferred to the Osawatomie State Hospital for a period of not to exceed ninety days, during which time the Osawatomie facility was to prepare and implement an appropriate program for Noel's reentry to society (the specific order will be set forth elsewhere in this opinion). The State appeals from this order upon a question reserved, pursuant to K.S.A. 1978 Supp. 22-3602(b)(3). Execution of the order has been stayed pending determination of this appeal.

The issues raised on appeal are complex, broad, and of great importance to the people of Kansas. At issue is the determination of the proper role of courts in deciding whether insanity acquit-

tees should be released and the conditions of release. To facilitate understanding of the issues, we will proceed on the following format:

1. Citation, in relevant part, of the statutes involved;
2. Decision of the district court;
3. Statement of the facts;
4. Statement of the issues; and
5. Discussion and determination of the issues.

## STATUTES

### K.S.A. 1978 Supp. 22-3428a:

"(1) Any person found not guilty because of insanity who remains in the state security hospital or a state hospital for over one year pursuant to a commitment under K.S.A. 1978 Supp. 22-3428 shall be entitled annually to request a hearing to determine whether or not such person continues to be dangerous to himself, herself or others. The request shall be made in writing to the district court of the county where the person is hospitalized and shall be signed by the committed person or such person's counsel. When the request is filed, the court shall forthwith give notice of the request to the chief medical officer of the state security hospital or state hospital where the person is committed, and such officer or such officer's designee, shall conduct a mental examination of the person and shall send the district court of the county where the person is hospitalized a report of such examination within twenty (20) days from the date upon which notice from the court was received.

"(2) Upon receipt of the report provided for in subsection (1), the court shall set a date for the hearing, giving notice thereof to the county or district attorney of the county where the person is hospitalized, the county or district attorney of the county in which the person was originally ordered committed, the committed person and such person's counsel. If there is no counsel of record, the court shall appoint a counsel for the committed person. The committed person shall have the right to procure, at his or her own expense, a mental examination by a physician of his or her own choosing. . . . Copies of each mental examination of the committed person shall be filed with the court at least five days prior to the hearing and copies thereof, when requested, shall be supplied to the county or district attorneys receiving notice pursuant to this section and the committed person's counsel.

"(3) At the hearing the committed person shall have the right to present evidence and cross examine the witnesses. Both county or district attorneys receiving notice pursuant to this section shall be permitted to participate in the hearing. At such hearing the court may make any order that a court is empowered to make pursuant to subsection (3) of K.S.A. 1978 Supp. 22-3428, and any amendments thereto. If the court finds the committed person is no longer dangerous to himself, herself or others, the court shall order the person discharged; otherwise, the person shall remain committed."

### K.S.A. 1978 Supp. 22-3428(3):

"If the court finds from evidence presented at the hearing that the discharge of the

patient will not pose a danger to the patient or others only if the patient continues to take prescribed medication or to receive periodic psychiatric treatment or guidance counseling, then the court, if it orders the discharge of the patient, may order as a condition to the discharge that the patient continue to take prescribed medication and report as directed to a person licensed to practice medicine and surgery to determine whether or not the patient is taking such medication, or that the patient continue to receive periodic psychiatric treatment or guidance counseling. The court also may order that the patient be placed under the temporary supervision of a state probation and parole officer or district court probation or parole personnel, or any appropriate private agency, who will be authorized to prepare a suitable community reentry program for the patient consistent with the recommendations, if any, of the person designated by the court to perform the mental evaluation. Such reentry program will be specifically designed to facilitate the return of the patient to the community as a functioning, self-supporting citizen, and may include appropriate supportive provisions for assistance in establishing residency, securing gainful employment, undergoing needed vocational rehabilitation, receiving marital and family counseling, and such other out-patient services that the designated agency identifies as beneficial. The jurisdiction of the court over the patient will terminate two years from the date of his or her conditional release and the supervisory authority over the patient then will expire unless earlier vacated by court order. At any time during the conditional release period, the patient, through his or her attorney, may move for full or partial release from the conditions of discharge, and the court shall hold an evidentiary hearing on the motion within fifteen (15) days of its filing. A copy of such motion shall be served on the county or district attorney at the time of filing. If the court finds from the evidence at the hearing that the conditional provisions of discharge should be modified or vacated, it shall so order. If at any time during the transitional period the designated medical officer or supervisory personnel informs the court that the patient is not satisfactorily complying with the provisions of the conditional release, the court after a hearing for which notice thereof has been given to the county or district attorney and the patient, may make orders for additional conditions of the discharge designed to effect the ends of the reentry program, or the court may order the county or district attorney to file an application to determine whether the patient is a mentally ill person as provided in K.S.A. 1978 Supp. 59-2913. In cases where such an application is ordered to be filed, the court shall proceed to hear and determine the application pursuant to the provisions of the act for obtaining treatment for a mentally ill person and such provisions shall apply to all subsequent proceedings."

## DECISION OF THE DISTRICT COURT

The decision was announced in open court on March 16, 1979, immediately following the closing arguments of counsel. The decision, from the transcript, is as follows:

" . . . [T]his is my first experience working under 22-3428a, and the power it gives the Court is about anything that is set out in 22-3428. There really isn't any argument but the fact that the petitioner, Carroll E. Noel, Jr., does not pose a danger to himself or others as long as he is on the prescribed medication. That tends to make me—it's incumbent upon the Court to discharge Mr. Noel. I see that

I really have little or no alternative in that regard. It is the conditions that we placed on Mr. Noel. Mr. Noel's family is not here today. I have no assurance that upon his discharge he even has a place to live, a job, or anything else. It's totally irresponsible for me to place him out into the community and simply say, 'Mr. Noel, you should take your medication every day.'

"The file indicates that Mr. Noel does not believe he should take his medication. I am, therefore, going to direct that Mr. Noel, on the 26th day of March, 1979, be transferred by personnel of Larned State Hospital to Osawatomie State Hospital. I would direct that Mr. Rein would give notice to Osawatomie State Hospital and that Mr. Noel would be arriving on March 26, 1979. I would further direct that Osawatomie State Hospital maintain Mr. Noel on his present medication; however, there I think I should leave it in the discretion of the medical personnel of Osawatomie State Hospital. If they decide that his medication should be changed due to some circumstances that I do not foresee, that they should have the discretion to give what they believe a reasonable amount of medication. That they should take into account the files and records compiled by Larned State Hospital over the past five years.

"I would further direct under this statute that Osawatomie State Hospital, within 90 days, beginning March 26, 1979, undertake to develop a program for Mr. Noel's reentry into the community.

"How far is Osawatomie State Hospital from where Mr. Noel's parents live? Is it a great distance?

"MR. TOMASIC [Wyandotte County District Attorney]: I think it's less than a hundred, Your Honor.

. . . .

"THE COURT: It's quite a lot less distance than from Wyandotte County to Larned State Hospital. That's for certain, so the personnel of Osawatomie State Hospital would be in a much better position in order to develop a workable program.

"I would further direct that the Osawatomie State Hospital, once they have developed a plan, that they should have from this Court the discretion to implement their plan, and that plan should include continuation of Mr. Noel on medication, the medication, the type which controls his behavior which led him to Larned State Hospital in the first place. Osawatomie State Hospital should have benefit of parole officers available to the Secretary of Corrections. They should have available to them any court services which may be offered by the Wyandotte County District Court in order to see that Mr. Noel stays on his medication, and that's where the problem will come, is if Mr. Noel does not take the medication and his condition reverts back. If that should happen, would you gentlemen have suggestions under this statute a course of action that this Court should take?

"MR. FELDT [Noel's counsel]: Your Honor, I only have a question regarding the release plan that the hospital is to develop, and then go forward with implementing it, or is it to submit the plan for the Court's approval?

"THE COURT: I would rather have Osawatomie State Hospital in the position to develop a plan and have the discretion to implement it without having to put together a plan, mail everything back here to Larned for me to review, I go through it, I okay it and mail it back to them.

"They are professionals; they understand that Mr. Noel is a citizen of that local community. I would rather they would have that amount of discretion.

. . . .

"MR. REIN [Larned State Hospital counsel]: Your Honor, I would ask whether or not the Court is indicating that the authority for Osawatomie State Hospital hold Mr. Noel during the 90 day period, which is completely pursuant to 3428a?

"THE COURT: That is correct. I think the condition of his release from Larned State Hospital—I can require him to stay in Osawatomie State Hospital for at least 90 days to enable us to develop a plan for his eventual reentry into the community.

. . . .

"MR. FELDT: I think the one thing that needs to be stressed in the Journal Entry is the specific direction to Osawatomie that the release plan contain requirement of daily supervision of taking the medication.

"THE COURT: That's the only reason Mr. Noel is being discharged, is because the daily medication should be supervised and given to him."

## STATEMENT OF FACTS

The evidence before the trial court splits itself into two categories:

1. Pre-commitment data (prior to March, 1974).

2. Post-commitment data (after March, 1974).

The pre-commitment data is summarized as follows:

Noel, a black male, has never married. He was approximately 38 years old at the time of commitment. Prior to the homicide, he was described as a quiet man who apparently had never broken the law, even to the point of acquiring a traffic ticket. Throughout his life he was characterized as a "loner", unable to make friends or trust anyone. These characteristics began in childhood and became more pronounced as the years went by. Feelings of persecution developed, with Noel believing that people were laughing at him, ridiculing him, and plotting against him. In time, the feelings of persecution deepened and became the dominant factor in his life. In 1972 he was working for the United States Post Office in Wyandotte County. By this time his condition had deteriorated to such a degree that outsiders were noticing that something was wrong. In 1972 Noel was complaining to the union steward and other authorities at the post office about plots against him and his sisters. The union steward concluded Noel had a serious psychiatric problem and urged Noel's family to seek psychiatric treatment for him. As a result thereof, in June, 1972, Noel became a patient in the psychiatric ward of a Veterans Administration Hospital.

In the V.A. Hospital Noel's illness was diagnosed as paranoid schizophrenia. Even as early as 1972, the object of Noel's delu-

sions was the United States Postal Service. With tranquilizing medication, Noel's symptoms were controlled. He was discharged from the hospital after a short stay, with instructions to continue taking the medication. Noel stopped taking the medication, apparently, shortly after his discharge. The delusions resurfaced with ever increasing intensity. Noel concluded the post office was going to force his sisters into prostitution; he saw postal trucks and their drivers as being armed with machine guns; and he believed a great postal conspiracy existed to harm him and his sisters. The postmaster, in Noel's mind, became the head of the conspiracy and his chief tormentor. Voices told him he must kill the postmaster to end the danger.

On November 29, 1973, after some two weeks of planning, Noel drove to the Kansas City, Kansas, post office, lawfully parked his car, concealed a long knife on his person, walked into the postmaster's office, and stabbed the postmaster to death (inflicting nine separate wounds). After having completed the task he came to do, he remained in the office and offered no resistance when arrested.

Noel was originally charged with murder in the federal court. Subsequently, this charge was dismissed and he was charged with first degree murder in the state court. While the federal charge was pending, Noel was examined, at federal request, by Dr. William V. McKnelly, Jr. Dr. McKnelly contacted the V.A. Hospital and obtained the data on Noel's prior hospitalization. He testified at the state trial. The doctor concurred with the V.A. diagnosis of paranoid schizophrenia and characterized the V.A.'s release of Noel as a blunder. Dr. McKnelly's testimony was thorough and showed extensive knowledge of Noel's background and condition. The bottom line of the McKnelly opinion is that Noel is and always will be a paranoid schizophrenic; that his is an extreme case of the disease; that Noel's potential for violent acts will remain; and that the disease may be suppressed in a structured setting with a low stress factor and daily appropriate administration of tranquilizing medication.

At trial Noel was found not guilty because of insanity and he was committed to the State Security Hospital at Larned. He was admitted to that facility on March 20, 1974.

The post-commitment data is summarized as follows:

In late 1975 the staff of the State Security Hospital reached the

conclusion that Noel was not dangerous to other patients and recommended transfer to Osawatomie State Hospital. About the same time, Noel filed a petition for writ of habeas corpus. Public opinion was aroused and pressure was brought not to make the transfer. By letter of March 12, 1976, Dr. Robert Harder, Director of Social and Rehabilitation Services, of which the state hospital system is a part, squelched the proposed transfer and pointed out to the Larned State Hospital Superintendent the undesirability of such a transfer and the dangers involved if Noel were returned to the community. Noel, as a result of the Harder letter, was transferred from the State Security side of the hospital to the regular Larned State Hospital. This was done pursuant to K.S.A. 22-3428(2), which authorized the chief medical officer of the security hospital to make such a transfer without hearing whenever he concludes the person is not dangerous to other patients. This transfer procedure does not involve a finding that the patient is no longer dangerous to himself or others, as required for discharge, but only that the patient is not dangerous to other patients. The Larned staff at no time in the proceeding recommended any discharge of Noel.

Having stated how Noel went from the security hospital to the regular Larned State Hospital, we will turn to the evidence as to Noel's condition during the committed years.

The principal evidence presented was the report of the Forensic Board of Review, dated February 26, 1979, and prepared for submission to the district court for consideration in the proceeding herein. Dr. John R. Tilton, a clinical psychologist who was Chairman of the Forensic Board of Review of the Larned State Hospital, testified, but the testimony was mainly confined to how the report was prepared, an explanation of the report, board procedures, etc. The only other witness was Ann Parker, a social worker employed by the Larned State Hospital. She was apparently called by defendant to lay the foundation for the admission into evidence of Noel's hospital records (Respondent's Exhibit No. 2). The court admitted the exhibit, but stated:

"But to save a lot of paperwork, in case there would be an appeal from this Court's decision, certainly all of Respondent's Exhibit 2 would not be relevant. It appears to me to be four or five inches thick, probably weighing close to 20 pounds; to process all of that on appeal would be somewhat ridiculous. I would admit Respondent's Exhibit No. 2, but if there is an appeal, I would invite counsel to go through that record and only extract from it that which would be relevant."

Immediately following the above statement, counsel made their closing arguments and the court made its oral ruling in the case. The district court had no apparent opportunity to examine the exhibit, nor is it before us, except for the transcript of the testimony of Dr. McKnelly at the jury trial. So that brings us back to the Forensic Board report and the testimony of Dr. Tilton.

Because of its importance, the report is included herein in its entirety (except for the background statement as to murder charge, transfer between institutions, etc.):

"SUMMARY OF CURRENT HOSPITALIZATION: On 1/29/79, a Ninety-day Reassessment was made by the Treatment Team responsible for Mr. Noel's care and treatment. It was noted in the report that Mr. Noel's psychotic symptoms presently are in remission, and have been for some time. He was not seen as a management problem, and it was noted that he was currently involved in the Larned State Hospital work program with special permission from Topeka to allow him to work four hours a day for an indefinite period. The established diagnosis is Schizophrenia, Paranoid Type in Remission (295.35).

"A psychological examination was performed on 2/5/79. A personality test given during this evaluation indicated that the clinical scale measurements were valid, and the clinical scales themselves were well within the normal range, suggesting that there was no psychosis, neurosis or character disorder. Discussions with Mr. Noel generally confirmed the suggestion. Another test suggested that Mr. Noel was currently investing much energy in obsessive-compulsive defenses against anxiety, with general success. He presents an apparently open facade to the world, but there is an underlying suspicion of others that produces a wariness that is greater than normal. Associated with the suspicion, and probably motivating it, is a great deal of repressed hostility.

"There is an element of grandiosity still present in his thinking which is not delusional, but which is great enough that it tints his thought processes. This might be expected in an adolescent but is inappropriate in a man of his age. It undoubtedly helps compensate for underlying feelings of inferiority and inadequacy.

"There is also indication of an underlying feeling of instability which could be related to his present situation, in that he does not know how long he will be in the hospital or what he will do when he gets out. However, other indices suggest that he may have occasional feelings of losing control, which supports the idea that the instability derives from a more fundamental anxiety and uncertainty about his ability to remain in control.

"The most recent comment of the social worker (2/21/79) states that regardless of the disposition of his case, some type of mandatory supervision of his medication and contacts on a frequent basis with a mental health facility is necessary. Mr. Noel has made statements that he doesn't think he has a mental problem, nor does he need medication. This attitude leaves the social worker to believe that it is a real possibility that he will discontinue his medication, and possibly become psychotic again if he is not highly supervised.

"Mr. Noel was systematically observed by Licensed Mental Health Technicians for a period of time and a rating was given on 2/22/79. Manifest ward behavior received a composite rating, was quantified on the Psychotic Inpatient Profile, and compared to standardized norms for drug-treated, inpatient males as a reference group. There were no statistically significant positive findings on the 12 syndromes rated.

"On the same day a Nursing Summary was written. In this summary it was noted that Mr. Noel maintains his adjustment to the ward. He knows and follows ward and hospital rules and regulations. He has not been a behavior or management problem. He still does not socialize to any great extent with other residents in the ward setting, but socializes better on a one-to-one basis. He is pleasant and courteous in most of his contacts with others. He can, on occasion, make mildly sarcastic comments when ward routine is changed for what he feels are insufficient reasons, but does not show any further behavior which is considered a problem.

"His hygiene and physical grooming, care of clothing and sleeping area remain very good. He is involved in a four-hour work program where he functions well and is involved also in activities the rest of the day. He attends his classes on time and participates well.

"At the present time, he has not indicated any evidence of being a danger to others or himself. His behavior and statements have been appropriate and do not evidence signs of psychosis or delusions.

"He has been stabilized on Thorazine 100 mg., p.o., b.i.d. His condition on this medication remains stable as it has been for quite sometime.

"Mr. Noel has indicated that he wishes he could be somewhere closer to his parents. He acknowledges that he is here for a crime he committed, but has indicated recently that he would rather not discuss what brought him here with the Team as a group, but is willing to discuss it privately with individual Team members.

"A current psychiatric up-date was conducted by the psychiatrist on 2/22/79. In the report, it was noted that Mr. Noel's pre-morbid lifestyle seemed to be quite schizoid. According to Mr. Noel, he experienced difficulties in high school with his studies. Mr. Noel does not have any significant heterosexual relationships, although he claims to have had a lot of girl friends. During his stay at the Larned State Hospital, his behavior has been observed to be mostly cooperative and motivated to help himself remain well. In an interview with Mr. Noel, the psychiatrist observed significant secretiveness where Mr. Noel did not wish to talk about certain events in his life, particularly in front of the Treatment Team and he requested to be seen privately. It appeared that his concept of friendship is one which is extremely superficial. He states that he has many friends at the Larned State Hospital, but there is nobody in the Larned State Hospital to whom he can talk to about his problems, tell his worries or be helped.

"Mr. Noel's pre-morbid personality and current adjusted personality features show a significantly secretive, rigid, lonely man who does not know what or whom to trust. Paranoia has been a feature of his personality for most of his life. It is conceivable that if Mr. Noel is exposed to a stressful circumstance, he would decompensate, but at this time and during the number of years he has been at the Larned State Hospital, he has not been observed to decompensate to the psychotic

level. His adaptation has been fair, and his ability to work has been good. His ability to make relationships is superficial, and he does use some denial and some projection as his main defenses. It was noted during the examination that Mr. Noel is well oriented in all spheres, and his memory for recent and remote events is intact. Thought processes are essentially non-psychotic. His mood is cooperative, shows signs of rigidity, inability to trust, and secretiveness. Affect is appropriate to his mood. He has no suicidal or homicidal ideations at the present time. The patient's judgment while living in a structured environment, like Larned State Hospital, has been fair. His insight has been minimal.

"SUMMARY OF FORENSIC REVIEW: The Larned State Hospital Forensic Review Board (J. R. Tilton, Ph.D., Psychologist III, M. Ryou, M.D., Ann Parker, LBSW, Barbara O. Keeley, R.N., B.S.) and staff members of the Larned State Hospital (Sharad Patel, M.D., Carol McConnell, R.N., Raymond Stacey, Psychologist I, Johanna Eddy, TQA) met on February 26, 1979, to study the case of Carroll E. Noel, Jr. The staff members unanimously noted that they had serious reservations about any direct discharge of Mr. Noel into the community. It was felt by the staff that Mr. Noel would stop taking his medication, and as a result, would decompensate quickly into a psychotic condition if he were to be put out on his own. It was also thought by the staff that Mr. Noel has received maximum benefits from treatment at the Larned State Hospital. One disturbing circumstance is the fact that Mr. Noel now thinks that he is innocent of the charges that have been made against him, and he wants to go to court to prove his innocence. This is seen by the staff as a very poor judgment on the part of the patient. The staff members went on to say that Mr. Noel is quite paranoid in his ideation, secretive, however, he denies having any hallucinations. The staff felt that he does not show any signs of hallucinations at the present time, and they consider him to not be presently psychotic.

"Mr. Noel was interviewed. He is a man of medium height and build, and he wore glasses which appeared to have a broken frame. He also wore a hat throughout the interview. He was casually dressed, and his appearance appeared to be somewhat neglected. His overall demeanor during the interview was fairly composed, however he was quite tense at times which might readily be expected under these circumstances. When asked if he was frightened, he responded by saying that he was 'a little nervous.' The quality of his speech was clear and comprehensible, and he answered all questions when asked with short and brief responses. He did appear to be very careful of his answers to all questions and when he was challenged about this fact, he did agree that he was not too trusting. His overall use of words was appropriate, and the organization of his speech was sequential and relevant. His affective expression was a studied calm, but it was quite obvious to all that he was quite anxious. However, this was considered to be situationally derived. His overall response to the interview was cooperative. However, he took an extended period of time to answer some of the questions and appeared to have to work quite hard to come up with a reasonable answer. He was very explicit in the fact that he felt that he does not need further hospitalization, and also that he does not need further psychotropic medication.

"When asked how he was getting along at the Larned State Hospital, he responded by saying, 'Pretty fair.' When he was asked why he was in the hospital, he responded by saying, 'They said I committed a felony and that I committed an

assault, and they called it first degree murder.' He also recognized the fact that an acquittal was the outcome because he was considered to be insane during the time that he committed the actions for which he was accused. He seems to be completely aware of this fact. Upon further questioning, Mr. Noel said that he felt that he was not presently mentally ill, and he also felt that he never had been mentally ill. When he was asked what he felt his future held for him, he responded by saying that he did not know. He also made the statement that he would, 'Like to get back into the mainstream.' Mr. Noel was then asked if he felt that he would be able to derive some benefit from being hospitalized at the Osawatomie State Hospital, and he responded by saying, 'Either there or the VA.' Mr. Noel was then asked if he felt he needed further psychiatric treatment, and he responded by saying, quite emphatically, that he needs no more treatment and also needs no more medication.

"Mr. Noel also expressed the fact that he had a talk with his attorney in the past, and he feels that the reason he is unable to either be discharged or transferred to the Osawatomie State Hospital is for what he calls, 'political reasons.' Also he stated that there was nothing wrong with him mentally or physically, and that he did not know why everyone was so concerned about him. He also stated that he doesn't feel that he needs further hospitalization. With regard to medication in the past, Mr. Noel stated that he was 'off and on' medication prior to the charges that were given to him. He also stated that he didn't have any plans to continue the medications that he was on at that time because they would make him have, 'the weirdest nightmares.' On further questioning, Mr. Noel stated that he feels he could support himself outside, but he, at the present time, does not know exactly how he would accomplish this. He was asked if he had any friends, and he responded by saying, 'I don't have any personal friends.' He also expressed the fact that he had heard voices for about a year in 1973 to 1974. He was then questioned again about where he would go if he were to be directly released, and he said that his parents 'probably' wanted him to come home. He was asked if he had talked with them about this, and he denied this fact stating, 'They have never talked to me about this at all.' Throughout the entire interview, Mr. Noel was very hesitant to respond to all questions asked of him, and appeared to be self-contained in his thinking and, perhaps, somewhat suspicious of the reasons why these questions were asked.

"After the interview, there was an extended discussion, and of general concern of the Board members and the staff was the fact that Mr. Noel does not feel that he needs hospitalization or any type of psychotropic medication in the future. It was also noted however, that he has not appeared to be dangerous to himself or other patients, or the staff for some period of time in the past."

### Dr. Tilton's direct testimony concluded with the following:

"Q. You are telling us then, Doctor, that it was a consensus of the Forensic Review Board that the patient is not dangerous to himself or to others at the present time?

"A. As long as he keeps taking his medication, with that qualification."

## STATEMENT OF ISSUES
The appellant designates a number of issues to be determined

on appeal. Looking through form to substance, it is apparent that there is one basic issue and various sub-issues as follows:

1.  Did the district court misperceive the role of the court in this proceeding, held pursuant to K.S.A. 1978 Supp. 22-3428a and, as a result of that fundamental misperception, did the district court err in

    (a) concluding that the opinion of the Forensic Review Board, as expressed by its chairman, to the effect that Noel "is not dangerous to himself or to others at the present time" (regardless of qualification thereon), was conclusive on the court and dispositive of the question of whether or not Noel should be discharged;

    (b) concluding that the question of conditions of such discharge, as authorized by K.S.A. 1978 Supp. 22-3428a and 22-3428, was a separate and distinct matter to be considered only after the determination to discharge had been made;

    (c) concluding that the court could legally delegate the development and implementation of Noel's reentry plan to the Osawatomie State Hospital, and thereby divest itself of any further involvement therein;

    (d) failing to assign the burden of proof to Noel; and

    (e) ordering that Noel be discharged from the Larned State Hospital?

## DISCUSSION AND DETERMINATION OF THE ISSUES

The basic issue on appeal is whether the district court misperceived the role of the court in the proceeding and, as a result of that fundamental misperception, committed a number of specifically enumerated errors. In order to resolve the basic issue we must first determine the proper role of the court.

The Kansas legislature has varied from time to time in our history as to whether the discharge of an insanity acquittee should be treated as a medical or a legal determination. See *e.g.,* L. 1911, ch. 299, § 5; L. 1915, ch. 339, § 1; K.S.A. 62-1532 (Corrick); K.S.A. 22-3428; *In re Timm,* 129 Kan. 126, 281 Pac. 863 (1929). In 1976 the question again became a matter for judicial determination. L. 1976, ch. 163, § 23. Under K.S.A. 1978 Supp. 22-3428 and 3428a involved herein (amended by L. 1979, ch. 97, §§ 1, 2, but not relative to the medical versus legal determination), the court is given the responsibility of making the final

determination in all proceedings for discharge except where the hospital seeks the discharge and the county or district attorney from the committing county does not object thereto. In such proceedings the court must determine whether the patient continues to be a danger to himself, herself or others.

The State argues that in making this determination the court's prime consideration should be whether that person continues to pose a danger to the public. Kansas law at one time provided that insanity acquittees should not be released by the court unless the asylum superintendent certified that "in his opinion such person is wholly recovered and that no person will be in danger by his discharge." L. 1911, ch. 299, § 5. The language in Kansas cases cited by the State is based upon this 1911 statute. *In re Beebe,* 92 Kan. 1026, 142 Pac. 269 (1914); *In re Clark,* 86 Kan. 539, 121 Pac. 492 (1912). See also *Hodison v. Rogers,* 137 Kan. 950, 22 P.2d 491 (1933); *In re Ostatter, Petitioner,* 103 Kan. 487, 175 Pac. 377 (1918). In *Clark,* 86 Kan. at 553, this court said:

"The purposes of the statute are highly beneficent. It gives protection to the public against repetitions of homicides or other acts of irresponsible frenzy or distraction, and affords to the unfortunate persons so committed safe seclusion and humane treatment, which it is the province of the state to give in the exercise of its parental power. The judicial department may not interfere with the legislative conscience, unless there is a clear violation of some provision of the constitution."

The statutes in effect herein (K.S.A. 1978 Supp. 22-3428a and 3428) use the term "others," but the intent to protect the public or community is clearly still within the statute. This is apparent from legislative action taken subsequent to the district court decision in this case. In 1979 HB 2501, amending the statutes herein, the Senate adopted the language "whether or not such person continues to be dangerous to the patient's self or others, *including persons in the community in the event the committed person is discharged or conditionally released."* The House did not concur with that and other amendments, and the conference committee dropped the emphasized portion, noting:

"It was further agreed that the Senate amendments which added the language 'or a danger to persons in the community if the patient is discharged or conditionally released' following the phrase 'continues to be a danger to the patient's self or others' was not needed, because the present law presently should be interpreted in that manner, and *that it was the legislative intent when the present statute was adopted that the phrase 'or others' includes persons in the community*

if the patient is discharged or conditionally released. Therefore, the additional language suggested by the Senate amendments are not necessary, since the *law presently includes a consideration of the potential for danger to persons in the community.*" Minutes, Conference Committee on House Bill 2501, p. 3, April 24, 1979. Emphasis added.

How, then, does the court proceed to make this determination? Numerous other jurisdictions have been faced with this question. The following is some well reasoned rationale from cases in other jurisdictions:

### *Hill v. State,* 358 So. 2d 190, 206-207, 208 (Fla. App. 1978):

"Expert psychiatric testimony is essential in these proceedings. But the committing court's determination of release issues cannot be dictated by such testimony. When determining the accused's competency at the time of an offense, the trial judge or jury is not bound to accept unrebutted psychiatric opinions when there is other evidence of the accused's competence. For stronger reasons, judges weighing the complex questions of dangerous propensities may properly find that unrebutted psychiatric opinion testimony is overcome by other substantial evidence. We do not denigrate psychiatric expertise. But that discipline does not claim infallible prophetic powers. Even within the field, opinions on the nature and extent of mental illness vary with 'the examining psychiatrist's personal conception of normal social behavior.' . . .

. . . . .

"To sum up, if a mental acquittee's entitlement to release is to be determined by a rule of law and according to evidence, there must be evidence. By evidence the court is to be given a rich understanding of the patient's medical history, present condition and behavior; prospective environment at liberty; the available resources for professional and lay observation and control; and the practicality of monitoring the success of a release plan."

### *State v. Cook,* 66 Wis. 2d 25, 32, 224 N.W.2d 194, 198 (1974):

"The opinion of the trial judge shows that he carefully evaluated the expert medical testimony. In his opinion, the trial judge recited the circumstances under which the defendant would in all probability be obliged to live were he released. He carefully balanced the psychiatric conclusion that the defendant was no longer acutely mentally ill against the testimony that the defendant still had a mental disorder, that his personality contained an abnormal amount of sociopathic anger, and that he had not been completely tested in normal environment. On the basis of these conflicting considerations, the trial judge, after a thoughtful and articulated analysis, concluded that he was not 'satisfied' that the defendant was not dangerous."

### *State v. Fields,* 77 N.J. 282, 307-308, 390 A.2d 574, 587 (1978):

"Judges considering the committee's [patient's] likely dangerousness for the purpose of assessing the appropriate level of restraints upon his liberty to be initially imposed and subsequently modified or terminated too often accord undue deference to the presumed expertise underlying psychiatric opinion on that

issue. While such psychiatric opinion certainly possesses probative significance, it is no more conclusive on the dangerousness issue than is evidence from lay sources concerning particular instances where the committee has manifested actual or potential harmful behavior. The final decision on the need for and appropriate extent of restrictions on the committee's liberty is *for the court, not the psychiatrists.*

"Judges may appropriately consider both expert opinion evidence and lay factual evidence in making their evaluation of the committee's potential dangerousness under the *Krol* [*State v. Krol,* 68 N.J. 236 (1975)] guidelines and the consequent need for restraint. They must always be mindful that it is their responsibility to ensure that the restraints imposed on the committee will adequately promote the goals of societal and personal safety. The determination of the level of restraints suitable for a particular committee is a matter entrusted to their sound discretion. Their decisions should be based upon their evaluation of all of the relevant evidence before them concerning the committee—psychiatric or otherwise—according each type such weight as they see fit. The ultimate order should reflect a careful judicial weighing of the competing concerns in light of that evidence, explicitly stating the bases for the conclusion reached."

### *People v. Giles,* 192 Colo. 240, 246, 557 P.2d 408 (1976):

"In a release hearing, the scope of inquiry is necessarily broad. The jury must weigh the defendant's desire for freedom against the risk that, if released, he may harm himself or others. To require the jury to decide this issue in an informational vacuum would be unfair to both the defendant and the public. A jury charged with such a heavy responsibility is entitled to hear all competent evidence relevant to the ultimate issue of whether the defendant meets the legal standard for release. Obviously, this includes evidence of the defendant's psychiatric history, the circumstances leading to his insanity plea and the resultant commitment, his prognosis for recovery, and all other relevant facts."

Note: In Colorado, release is determined by a jury, but the principle is the same.

In *United States v. Ecker,* 543 F.2d 178, 183-187 (D.C. Cir. 1976), *cert. denied* 429 U.S. 1063 (1977), the court discussed the standard of review to be applied by the district court in determining the release of an insanity acquittee, which is summarized as follows: In both conditional and unconditional release proceedings, the district court must weigh the evidence in the same manner that it does in deciding matters de novo. The reviewing court, as the trier of fact, must independently weigh and evaluate the evidence. Thus, the weight to be given any expert opinion admitted into evidence is exclusively for the judge, and the judge is not bound to accept the opinion of any expert witness or group of expert witnesses. The hospital's certification that the patient is ready for conditional release should be viewed as an amalgamation of expert opinion which the trial judge must weigh along

with all other evidence. The judge's determination can be based on other evidence in the record besides expert testimony, such as the patient's hospital file, the court files and records in the case, and illumination provided by counsel. The policy rationale underlying judicial review of both conditional and unconditional release is to provide for the treatment and cure of the mentally ill in a manner which affords reasonable assurance for public safety; it assures that members of the patient's exceptionally dangerous class are kept under hospital restraint until the district court approves a relaxation of that restraint. Thus, the role of the district court is not simply to review the hospital's decision for unreasonableness, but rather to decide the ultimate question of whether the present status of the patient is such that continued confinement without release is justifiable.

The above are but examples of how other jurisdictions have dealt with the complex question of the proper role of the court in insanity acquittee proceedings.

We conclude the determination of whether the patient continues to be dangerous to himself, herself or others is a legal rather than a medical decision. In any such determination, due consideration must be given to the protection of the public. The court has the obligation to weigh all the evidence in the case, including medical opinions, and reach an independent judgment. A medical opinion as to dangerousness, even if undisputed by other medical opinions, is not conclusive upon the court and must be weighed with the other evidence.

The determination of both dangerousness and the suitability of conditional discharge safeguards (discussed later in this opinion) involves prediction of the patient's future conduct rather than mere characterization of past conduct. Nonetheless, the patient's past conduct is important evidence as to his future conduct. It is appropriate for the court to give substantial weight to the nature and seriousness of the crime committed by the patient and its relationship to his present medical condition. See *State v. Fields,* 77 N.J. at 307.

Obviously, if the court determines the committed person is no longer dangerous to himself, herself or others, it must order the person discharged. If the court makes an unqualified finding that the committed person continues to be a danger to himself, herself or others, then the person must continue to be committed.

We turn now to the area of conditional releases. The precise language of K.S.A. 1978 Supp. 22-3428(3) is significant and will be repeated with emphasis added:

"If the court finds from evidence presented at the hearing that the discharge of the patient will not pose a danger to the patient or others only if the patient continues to take prescribed medication or to receive periodic psychiatric treatment or guidance counseling, *then the court, if it orders the discharge of the patient,* may order as a condition to the discharge that the patient continue to take prescribed medication and report as directed to a person licensed to practice medicine and surgery to determine whether or not the patient is taking such medication, or that the patient continue to receive periodic psychiatric treatment or guidance counseling."

If the finding is conditional as to the patient's not posing a danger to himself or others, the court is not required to discharge the patient. To discharge or not to discharge is still discretionary with the court. In exercising its discretion, the district court must consider whether any proposed conditions of discharge would truly accomplish their purpose; that is, to safeguard the patient and the public. If the court determines adequate safeguards are not present, then the patient should not be discharged. In any consideration of a reentry plan, the court should look to all aspects of the risks posed by the patient, the patient's condition, and examine every facet of the plan to determine if it will realistically accomplish its purpose. If the court is satisfied that conditional discharge is appropriate, it may order the conditional discharge in accordance with the statutory provisions of K.S.A. 1978 Supp. 22-3428(3).

In the district court's consideration of conditional discharge of the patient, the determination as to dangerousness, whether discharge should or should not be ordered, and whether the conditional safeguards will accomplish their purpose, are all aspects of the same consideration and cannot be separately determined. If conditional discharge is ordered, the court should state with particularity the basis for its conclusion. Throughout any such period of conditional release the court's jurisdiction continues in a similar manner as to persons on probation from criminal convictions.

Before concluding this discussion of the court's proper role, we note that among the 1979 amendments to K.S.A. 1978 Supp. 22-3428(3) is the following:

"In order to insure the safety and welfare of the patient and the citizenry of the

state the court may allow the patient to remain in custody at a facility under the supervision of the secretary of social and rehabilitation services for a period of time not to exceed thirty (30) days in order to permit sufficient time for said secretary to prepare recommendations to the court for a suitable reentry program for the patient." L. 1979, ch. 97, § 1.

This should be of assistance to the courts in making these difficult determinations.

We turn now to the basic issue as to whether the district court misperceived its role in the proceedings and, as a result of that fundamental misperception, committed a number of specifically enumerated errors.

The district court's decision appears in its entirety earlier in this opinion and will not be repeated.

We must conclude that the district court did misperceive its role in the proceedings and, as a result of that fundamental misperception, did commit the following errors:

1. The court considered the determination as to "dangerousness" to be medical rather than legal. The only current medical opinion at trial was the amalgamated hospital position (Forensic Review Board's report and the testimony of its chairman) to the effect that Noel was not presently dangerous, with qualification of continued medication. The Forensic Review Board's report goes somewhat further and adds qualifications of suitable environment and lack of stress. The court clearly felt it had no alternative but to accept the medical opinion as to the ultimate fact, and did not weigh any evidence or reach an independent judgment.

2. The court determined the "dangerousness" question and ordered Noel's discharge prior to even considering the conditions to be imposed. As we previously stated, when conditional release is being considered, dangerousness, discharge, and conditional safeguards are all aspects of this consideration and cannot be separated. The court appears to have been unaware of the fact it could have found that Noel did not pose a danger to himself or others as long as he was on the prescribed medication, and it could still have denied discharge by virtue of the conditions being insufficient safeguards.

Dr. McKnelly, the psychiatrist testifying at the murder trial, evaluated Noel when his paranoid schizophrenia was out of control. It has been controlled at the hospital. The Forensic Board of Review evaluating Noel saw him when the medicine and his environment were controlling the disease. The hospital readily

admitted that if Noel's special needs were not met he would go out of control again.

The following analogy illustrates the inappropriateness of splitting consideration of dangerousness from consideration of safeguards. Let us suppose a court is called upon to determine whether a shipment of nitroglycerine can be stored in the center of a large city. The experts testify that nitroglycerine is not dangerous as long as it is stored at temperatures below 180° Fahrenheit and is not jiggled. No evidence is admitted as to the conditions under which the nitroglycerine is proposed to be kept, or supervision thereof. It would obviously be error for the court to conclude the explosive presented no risk as long as its needs were met, and to delegate determination of proper conditions to others.

3. The court had no authority to shift the responsibility of fixing conditions of discharge (*i.e.*, reentry program), and of implementing and supervising same, to the Osawatomie State Hospital. If conditional discharge were to be ordered, it had to be on conditions specifically approved by the court. Further, no statutory authority exists for placing Noel under the supervision of a state hospital upon conditional discharge.

4. The court had no authority to divest itself of jurisdiction of Noel during the conditional release, which is the effect of the order.

5. The court ordered the discharge of Noel, with no information whatsoever as to such basics as the circumstances under which he would be living, how he would support himself, or what measures would be taken to assure continuance of the medication.

By virtue of the numerous errors hereinbefore listed, and without further elaboration, we conclude the discharge of Noel was erroneous.

One other issue is raised. The State contends the court erred in failing to assign the burden of proof to Noel. The record is clear that Noel was the moving party. At the beginning of the hearing, Noel's counsel was asked by the court whether he was "prepared to go forward." Counsel responded that he was and called his first witness. There is no evidence that the court placed the burden of proof other than on Noel. The statute herein, K.S.A. 1978 Supp. 22-3428a, is silent as to burden of proof. The statute was amended in 1979, subsequent to the proceedings herein, to provide:

"The committed person shall have the burden of proof to show by a preponderance of the evidence that the committed person is not a danger to such person's self or others." (L. 1979, ch. 97, § 2)

All issues herein have been determined.

Before concluding, however, some additional comments will be made in the hope of preventing a repetition in future cases of some of the basic problems present in this case. We note that whereas K.S.A. 1978 Supp. 22-3428a and 3428 have been amended subsequent to this case, the amendments do not alter the court's role in determining such cases.

As we previously stated, K.S.A. 1978 Supp. 22-3428 applies to hospital-initiated discharge proceedings. Under this statute the court is required to order an independent mental evaluation of the patient. In such a proceeding, presumably both patient and hospital are seeking the patient's discharge and are allied to a certain degree in interest. The independent evaluation gives the court a second medical opinion to weigh along with the other evidence. K.S.A. 1978 Supp. 22-3428a applies to patient-initiated discharge where, presumably, the hospital position and that of the patient are in opposition. In such a proceeding the court, on request of the patient, must order an evaluation. It is the statutory plan that generally the court will have the benefit of a medical opinion other than that of the hospital. Because the case before us was a patient-initiated proceeding (under K.S.A. 1978 Supp. 22-3428a), the mandatory outside evaluation procedures of K.S.A. 1978 Supp. 22-3428 did not apply. The patient requested no outside evaluation, so none was ordered. Accordingly, the court had only one medical opinion on the patient's current mental condition.

The area of insanity acquittee discharge is a highly sensitive issue with the public. The earlier statements herein, relative to the circumstances of Noel's transfer from the State Security Hospital to the civil side of the Larned facility, reflect the sensitivity of the hospital. The Forensic Review Board's report herein was carefully phrased. Noel's potential for being dangerous to others appears throughout. The hospital at no time recommends discharge. The report basically says Noel is not presently dangerous if (1) he takes the prescribed medication; (2) he is in a suitable environment; and (3) he is not subject to stress. The report makes no suggestion of specific conditions to be imposed to safeguard the public.

If Noel's discharge had not been stayed, and if a further act of violence had been committed by Noel, the hospital would have been in an ideal position to respond to public criticism by simply showing from the court's own files:

1. The hospital never recommended Noel's discharge;
2. The hospital told the court Noel was dangerous unless his various special needs were met; and
3. The court discharged Noel anyway.

It is indeed ironic that the court felt, based solely on the hospital's opinion, that it had no alternative but to discharge Noel. It is incumbent upon courts, for the protection of the public, to give due consideration to all factors in weighing the evidence and making their determinations in all cases such as the case herein.

In uncontested discharges of insanity acquittees, the hospital makes the final determination and is responsible therefor. In contested discharges of insanity acquittees, the court makes the final determination and is responsible therefor. The case before us resulted in the worst of both worlds. The hospital did not determine discharge was appropriate and the court ended up discharging Noel because it felt it was bound by the hospital's position. Accordingly, Noel was discharged with neither hospital nor court satisfied such action was appropriate.

The application to discharge herein was filed on February 14, 1979. K.S.A. 1978 Supp. 22-3428a permits annual filing of such applications by an insanity acquittee. Any new filing of an application by Noel will be governed by the amendments to said statute (L. 1979, ch. 97, § 2), which provide, *inter alia*:

"Within five (5) days after receiving the report of the examination pursuant to this subsection, the county or district attorney receiving the same may file a motion with the district court that gave the notice, requesting such court to change the venue of the hearing to the district court of the county in which the person was originally committed. Upon receipt of such motion and the report of the mental examination such court shall forthwith transfer the hearing to the district court specified in the motion and send a copy of the court's records of the proceedings to such court."

The judgment is reversed.

FROMME, J., not participating.