No. 51,265

In the Matter of the Application of George C. Jones, Jr., for a Writ of Habeas Corpus

(612 P.2d 1211)

Opinion filed June 14, 1980.

*Lee Thompson,* of Martin, Pringle, Fair, Davis & Oliver, of Wichita, argued the cause, and *Robert Martin,* of the same firm, was with him on the brief for the petitioner.

*Thomas D. Haney,* deputy attorney general, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for the respondent.

The opinion of the court was delivered by

McFarland, J.: Petitioner George C. Jones, Jr., was found not guilty because of insanity of five counts of embezzlement from a bank (K.S.A. 9-2012), and felony theft (K.S.A. 1979 Supp. 21-3701). The trial was to the district court of McPherson County and was heard on the written stipulations of the parties. In accordance with the provisions of K.S.A. 1979 Supp. 22-3428 the petitioner was committed to the state security hospital for safekeeping and treatment. In this original habeas corpus action the petitioner challenges the constitutionality of the mandatory commitment provision of said statute.

While not raised by the State-respondent, certain procedural and jurisdictional problems are inherent in this action. When such is the case, this court has the duty to determine the same prior to any consideration of the issues on their merits. See *In re Lakeview Gardens, Inc.,* 227 Kan. 161, Syl. ¶8, 605 P.2d 576 (1980). Trial of the criminal cases was had on all five counts (arising from two cases) on May 16, 1979, with the petitioner being found not guilty because of insanity on each count. On June 14, 1979, the following occurred, as set forth in the trial court's journal entry:

"WHEREUPON, the defendant orally submits the motion previously filed with the Court to determine the applicability of K.S.A. 22-3428, in light of the facts of this action, and for an order ruling that this statute does not apply.

"WHEREUPON, the defendant presents oral argument in support of his motion, and proffers the availability of evidence to be taken by the Court by way of testimony of Dr. Leonard H. Kapelovitz, Dr. Steve Shelton, and Mr. Vernon Nikkel, all of whom would testify that the defendant is not currently dangerous, not in need of safekeeping, and not in need of additional treatment.

"WHEREUPON, the State presents oral argument in opposition to defendant's motion and contends that the provisions of K.S.A. 22-3428 are mandatory and that introduction of evidence is irrelevant for purposes of determining the commitment following an acquittal on the grounds of insanity.

"WHEREUPON, the Court, having heard the arguments of counsel and being advised in the premises, rules and enters Conclusions of Law as follows:

"1.   That evidence as to present sanity of the defendant, proffered by the defendant, is not admissible.

"2.   The statute, K.S.A. 22-3428, does not establish a rebuttable presumption as to present insanity.

"3.   The Court further rules that the statute establishes a procedure not a presumption.

"4.   The Court further rules that the statute does not apply only to trial by jury; and

"5.   The Court further rules that K.S.A. 22-3428 is constitutional, does not unreasonably deprive a defendant of his liberty without due process of law nor does it contain a denial of due process or equal protection as guaranteed the defendant by the constitution of the State of Kansas and the United States of America.

"THEREUPON, the Court having entered its conclusions of law, denies defendant's motion for hearing to determine the applicability of K.S.A. 22-3428.

"THEREUPON, the defendant moves for the proffer of evidence by the taking of live testimony of the witnesses present and available for cross-examination. Whereupon, the State, being duly advised in the premises of the nature of the testimony, stipulates that the facts recited by the attorney for the defendant would comprise the testimony of the witnesses present and available for cross-examination in any hearing in the event defendant's motion had been granted.

"WHEREUPON, the defendant moves for an order pursuant to K.S.A. 22-3408 [*sic*] setting reasonable bond during the pendency of an appeal from the denial of defendant's motion to determine the applicability of K.S.A. 22-3428. Whereupon, the State opposes the motion.

"THEREUPON, the Court, having heard the arguments of counsel and being duly advised in the premises, rules that defendant's motion for bond is, and shall hereby be, denied.

"THEREUPON, the Court on its own, issues a stay of execution of the commitment of the defendant until July 16, 1979, at 9:00 A.M.

"IT IS SO ORDERED, ADJUDGED AND DECREED."

On June 14, 1979, the petitioner filed notices of appeal of both criminal cases to the Court of Appeals, where they were subsequently docketed as Cases Nos. 51,219 and 51,220. On July 5, 1979, the Court of Appeals entered the following order:

"The application for release of the appellant in the above two cases is denied for lack of statutory authority of this court to grant it.

"It appearing: (a) that there is no statutory authority for an appeal from an order of commitment under K.S.A. 1978 Supp. 22-3428, and (b) that appellant's remedy is by way of habeas corpus, with custody pending the proceeding to be covered by K.S.A. 60-1505(c), the appellant is ordered to show cause, if any, on or before July 18, 1979, why these appeals should not be dismissed for lack of jurisdiction.

"It is further ordered that these two cases be consolidated under No. 51,219 for all further proceedings, including any response to this order."

On July 11, 1979, after receipt of the above order of the Court of Appeals, petitioner filed this original action in habeas corpus with the Court of Appeals, which was accompanied by a motion for a temporary order staying commitment.

On July 12, 1979, the Court of Appeals entered the following order:

"You are hereby notified of the following action taken in the above entitled case:

"Petition for Writ of Habeas Corpus.

"State directed to respond to petition on or before August 3, 1979.

"Motion by Petitioner for temporary order staying commitment.

"Granted. Commitment stayed pending final decision and until further order of the court."

On July 18, 1979, petitioner filed the following response in the now consolidated direct appeals:

"COMES NOW the appellant, George C. Jones, Jr., by and through his attorney of record and submits this, his response to the Order of the Court dated July 5, 1979, directing that he show cause, if any, why the appeals consolidated herein should not be dismissed for lack of jurisdiction.

"1. Appellant knows of no specific statutory authority for an appeal from an order of commitment under K.S.A. 1978 Supp. 22-3428.

"2. That the appeals originally taken herein were premised upon language permitting appeals from final judgments in either criminal actions, K.S.A. 1978 Supp. 22-3601 and 22-3602, and civil actions, K.S.A. 60-2101 and 60-2102.

"3. That since a commitment directed pursuant to K.S.A. 1978 Supp. 22-3428, appears to be neither criminal nor civil in nature, it seems appropriate to appellant at this time to proceed by way of Habeas Corpus, which such action is on file with the Court, Case No. 51,265."

On July 19, 1979, the Court of Appeals dismissed the consolidated direct appeals of the criminal cases, said action being taken "on the basis of appellant's response."

On December 3, 1979, the case herein was transferred to this court from the Court of Appeals.

From the facts and procedural history of the petitioner-appel-

lant's efforts· to have an appellate court determine the constitutional issues raised, we note the following:

1. Petitioner is now a resident of the State of Colorado.

2. Petitioner is not now nor has he ever been in the custody of the Secretary of Corrections or the state security hospital.

3. Petitioner is not under bond nor subject to any restrictions upon his liberty, such as limitations upon where he may reside, a duty to report, or proscription on travel. But for the stay of commitment entered by the Court of Appeals, the commitment would have been effectuated.

4. No individuals are named as respondents. The Court of Appeals directed the "State" to respond. Thomas D. Haney, assistant attorney general, who prosecuted the case in such capacity, filed an answer on behalf of the "respondents."

5. It is unclear whether petitioner is maintaining the action pursuant to K.S.A. 60-1507 or 60-1501. A prerequisite to K.S.A. 60-1507 is that the petitioner be a "prisoner in custody under sentence." K.S.A. 60-1501 provides:

"Subject to the provisions of K.S.A. 60-1507 any person in this state who is detained, confined, or restrained of liberty on any pretense whatsoever, and any parent, guardian, or next friend for the protection of infants or allegedly incapacitated or incompetent persons, physically present in this state may prosecute a writ of habeas corpus in the supreme court, court of appeals or the district court of the county in which such restraint is taking place. No docket fee shall be required."

Under either statute serious questions of applicability may be raised.

6. The Court of Appeals prompted the filing of this original action by its order of July 5, 1979, and in so doing apparently concluded that an action pursuant to K.S.A. 60-1501 would be appropriate, inasmuch as the order made reference to custody being "covered by K.S.A. 60-1505(c)."

7. Petitioner's challenge to the constitutionality of the mandatory commitment provision of K.S.A. 1979 Supp. 22-3428 has been pending in the appellate courts in one form or another for almost a year.

8. The issues raised are of statewide significance in the administration of the criminal justice system.

In considering the jurisdictional issue in *Levier v. State,* 209 Kan. 442, 450, 497 P.2d 265 (1972), this court stated:

"First of all, K.S.A. 60-102 mandates that the provisions of the code 'shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding'. Habeas corpus is that kind of remedy. 60-202 provides that there shall be but one form of action to be known as a 'civil action'. 60-1505(d), prescribing the judgment which may be entered in a habeas corpus proceeding, states 'the court may make such other orders as justice and equity . . . may require'. Finally, K.S.A. 60-2606 provides:

" 'If a case arises in which an action or proceeding for the enforcement or protection of a substantive right, or the redress or prevention of a wrong, cannot be had under any specific provisions of this chapter or other statutes then the court shall proceed as nearly in conformity with the provisions of this chapter as the circumstances permit to do whatever law and equity and justice require for the protection of the parties.' "

Under the totality of the unique circumstances existing herein, and based upon the rationale of *Levier,* above stated, we conclude the interests of the parties and justice are better served by determining the issues on their merits at this time rather than by dismissing the action on procedural grounds to await the refiling of this action after the commitment is effectuated.

We shall now consider this original action on its merits. The challenged statute is K.S.A. 1979 Supp. 22-3428(1), which provides:

"(1) When a person is acquitted on the ground that such person was insane at the time of the commission of the alleged crime the verdict shall be 'not guilty because of insanity,' and the person so acquitted shall be committed to the state security hospital for safekeeping and treatment."

The petitioner contends that his mandatory commitment to the state security hospital pursuant to said statute:

1. Violates his right to due process of law, as the commitment is automatic without determination of his present mental condition;

2. Violates the equal protection clause of the Fourteenth Amendment to the United States Constitution, as any person involuntarily committed civilly to a mental hospital pursuant to the act for obtaining treatment for a mentally ill person (K.S.A. 59-2901 *et seq.*) is afforded á hearing to determine present mental condition and need of treatment prior to such commitment; and

3. Constitutes cruel and unusual punishment.

Before considering the specific challenges to the statute the basic principles which the courts must apply in determining the constitutionality of a statute should be set forth. These general

principles were stated in *City of Baxter Springs v. Bryant,* 226 Kan. 383, Syl. ¶¶ 1-4, 598 P.2d 1051 (1979), as follows:

"The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution."

"In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it and, if there is any reasonable way to construe the statute as constitutionally valid, that should be done."

"Statutes are not stricken down unless the infringement of the superior law is clear beyond substantial doubt."

"The propriety, wisdom, necessity and expedience of legislation are exclusively matters for legislative determination and courts will not invalidate laws, otherwise constitutional, because the members of the court do not consider the statute in the public interest of the state, since, necessarily, what the views of members of the court may be upon the subject is wholly immaterial and it is not the province nor the right of courts to determine the wisdom of legislation touching the public interest as that is a legislative function with which courts cannot interfere."

*In re Clark,* 86 Kan. 539, 121 Pac. 492 (1912), involved an unsuccessful constitutional challenge to a much more severe mandatory commitment statute. In *Clark,* at 553, the court stated:

"The purposes of the statute are highly beneficent. It gives protection to the public against repetitions of homicides or other acts of irresponsible frenzy or distraction, and affords to the unfortunate persons so committed safe seclusion and humane treatment, which it is the province of the state to give in the exercise of its parental power. The judicial department may not interfere with the legislative conscience, unless there is a clear violation of some provision of the constitution."

The petitioner attempts to separate the question of due process from the question of equal protection. Inasmuch as many of the cases cited involved both grounds, it would appear more expeditious to consider the issues jointly.

The pertinent provisions of the Fourteenth Amendment are as follows:

"[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

What constitutes "due process of law" is a question with which courts have long struggled. A universal standard applicable to all situations has not surfaced. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 33 L.Ed.2d 484, 92 S.Ct. 2593 (1972). "Protection from arbitrary governmental action is the essence of due process." *Baker v. List and Clark*

*Construction Co.,* 222 Kan. 127, 134, 563 P.2d 431 (1977). Akin to freedom from arbitrariness is the doctrine of "substantive" due process. "If the goals sought are legitimate, and the classification adopted is rationally related to the achievement of those goals, then the action of Congress is not so arbitrary as to violate the Due Process Clause." *Richardson v. Belcher,* 404 U.S. 78, 84, 30 L.Ed.2d 231, 92 S.Ct. 254 (1971). "[I]f a statute is necessary for the effectuation of a legitimate and substantial state interest, and not applied in an arbitrary or capricious manner, it would not violate the due process clause." *Wesley Medical Center v. McCain,* 226 Kan. 263, 266, 597 P.2d 1088 (1979); *Kansas Commission on Civil Rights v. Sears, Roebuck & Co.,* 216 Kan. 306, 318, 532 P.2d 1263 (1975). "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 6 L.Ed.2d 1230, 81 S.Ct. 1743 (1961). "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge,* 424 U.S. 319, 335, 47 L.Ed.2d 18, 96 S.Ct. 893 (1976).

"Equal protection of the laws" has also frequently been considered. In *State ex rel. Schneider v. Liggett,* 223 Kan. 610, 616, 576 P.2d 221 (1978), this court stated:

"Our next concern is whether the statute offends the equal protection clause. When considering this question we must first determine the proper test. Traditionally, the yardstick for measuring equal protection arguments has been the 'reasonable basis' test. The standard was set forth in *McGowan v. Maryland,* 366 U.S. 420, 425-26, 6 L.Ed.2d 393, 81 S.Ct. 1101:

" '. . . The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. . . .'

"In *Dandridge v. Williams,* 397 U.S. 471, 25 L.Ed.2d 491, 90 S.Ct. 1153, reh. denied 398 U.S. 914, 26 L.Ed.2d 80, 90 S.Ct. 1684, it was stated:

" '. . . If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78. . . .' (p. 485.)"

In *State v. Goodseal,* 220 Kan. 487, 493-494, 553 P.2d 279 (1976), this court stated:

"Appellant makes the further broad assertion that application of the felony murder rule in his case constitutes the infliction of cruel and unusual punishment and denial of his rights of equal protection and due process. The felony murder rule represents a longstanding policy of this state. We have already indicated its rationale—to furnish an added deterrent to the perpetration of felonies which, by their nature or the attendant circumstances, create a foreseeable risk of death. 'The legislature, acting in the exercise of the police power of the state, is empowered to enact measures in furtherance of the public welfare and safety, and its enactments in such areas are not to be judicially curtailed where they reasonably relate to the ends sought to be attained. Classification honestly designed to protect the public from evils which might otherwise arise are to be upheld unless they are unreasonable, arbitrary or oppressive' (*State v. Weathers,* 205 Kan. 329, Syl. para. 1 & 2, 469 P.2d 292). The felony murder rule, designed as it is to protect human life, represents sound public policy, is reasonably related to the end sought to be accomplished and is not constitutionally impermissible."

In *Baxstrom v. Herold,* 383 U.S. 107, 111, 15 L.Ed.2d 620, 86 S.Ct. 760 (1966), it was held:

"Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made."

Petitioner's due process and equal protection arguments attack the statute in general as well as its application to the petitioner under his particular factual situation. We will first consider the general question of whether mandatory commitment of insanity acquittees is violative of due process and a denial of equal protection. The petitioner does not contend that the disposition of cases involving insanity acquittees is beyond legitimate state interest and purpose. He does contend, however, that the mandatory commitment of such persons without a separate hearing to determine present condition is not reasonably related to the legitimate state purpose.

In determining the questions it is necessary to examine the law of Kansas as it relates to the defense of insanity, commitment of persons found not guilty because of insanity, and post-commit-

ment procedures. Only by such means can the mandatory commitment provision be viewed in its proper perspective.

K.S.A. 1979 Supp. 22-3219 provides:

"(1) Evidence of mental disease or defect excluding criminal responsibility is not admissible upon a trial unless the defendant serves upon the prosecuting attorney and files with the court a written notice of such defendant's intention to rely upon the defense of insanity. Such notice must be served and filed before trial and not more than thirty days after entry of the plea of not guilty to the information or indictment. For good cause shown the court may permit notice at a later date.

"(2) A defendant who files a notice of intention to rely on the defense of insanity thereby submits and consents to abide by such further orders as the court may make requiring the mental examination of the defendant and designating the place of examination and the physician or physicians by whom such examination shall be made. No order of the court respecting a mental examination shall preclude the defendant from procuring at such defendant's own expense an examination by a physician of such defendant's own choosing. A defendant requesting a mental examination pursuant to K.S.A. 22-4508 may request a physician of such defendant's own choosing. The judge shall inquire as to the estimated cost for such examination and shall appoint the requested physician if such physician agrees to accept compensation in an amount in accordance with the compensation standards set by the board of supervisors of panels to aid indigent defendants. A report of each mental examination of the defendant shall be filed in the court and copies thereof shall be supplied to the defendant and the prosecuting attorney."

We see from this statute that insanity is a matter which must be specifically raised by a defendant if he intends to rely on same as a defense to the charges.

Determination of competency to stand trial pursuant to K.S.A. 1979 Supp. 22-3302 may be raised by defense counsel, the court, or the prosecution. Such determination differs from and is unrelated to an insanity defense. See *Van Dusen v. State,* 197 Kan. 718, 421 P.2d 197 (1966).

After an insanity defense is asserted, and assuming the evidence at trial puts the matter at issue, the trier of the facts must determine whether or not the defendant was insane at the time of the commission of the offense. The test long utilized in Kansas for such determination is the *M'Naghten* rule.

In *State v. Andrews,* 187 Kan. 458, 465, 357 P.2d 739 (1960), *cert. denied* 368 U.S. 868 (1961), this court approved the following instruction as a "very accurate statement of the law of this state since the first decisions of this court on the subject":

" '14.  Insanity, to constitute a legal defense to the charge of crime, means that

the defendant is laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he is doing, or if he did know it, that he did not know that what he was doing was wrong because of his mental inability to distinguish between right and wrong, and if these facts exist, then the law does not hold him responsible for his act. On the other hand, if a defendant is mentally capable of understanding what he is doing and has the power to know that his act was wrong, then the law will hold him criminally responsible for it. If this power of discrimination existed, he was sane in the eyes of the law. A person of sound mind and discretion will not be exempted from punishment because he might have been a person of weak intellect or one whose moral perceptions were blunted or ill developed, or because his mind may have been depressed or distracted from brooding over misfortunes or disappointments, or because he may have been wrought up to the greatest and most intense mental excitement from sentiments of disappointment, rage, revenge, or anger. The law recognizes no form of insanity, although the mental faculties may be disordered or deranged, which will furnish one immunity from punishment for an act declared by the law to be criminal, so long as the person committing the act had the capacity to know what he was doing and the power to know that his act was wrong.' "

The present Pattern Instructions for Kansas (PIK [Criminal]) recommends the following simplified instruction:

"PIK 54.10 INSANITY—MENTAL ILLNESS OR DEFECT

"The defendant has denied criminal responsibility because of lack of mental capacity at the time the offense was committed. In law, this is called insanity. The defendant is not criminally responsible for his acts if his mental capacity was such that he did not understand the nature of his acts or did not understand that what he was doing was wrong because of his mental inability to distinguish between right and wrong.

"If you have a reasonable doubt as to the mental capacity of the defendant at the time of the alleged commission of the offense, then you should find the defendant not guilty because of insanity."

The *M'Naghten* test has often been criticized by those who believe it is too strict and unenlightened in view of advances in modern psychiatry. The pros and cons of such argument are inappropriate herein, as the *M'Naghten* rule is not challenged. For a full discussion thereof, see *State v. Sanders,* 225 Kan. 147, 587 P.2d 893 (1978). The *M'Naghten* rule is the law of this state. If degrees of insanity were placed on a scale of one to ten in ascending order of severity, those failing the *M'Naghten* test are all "tens." To fail the *M'Naghten* test one must not have understood the nature of his acts or that such acts were wrong—the so-called right and wrong test. Generally speaking, evidence that a defendant attempted to conceal the crime or his identity as the perpetrator thereof goes a long way to defeat an insanity defense. Again, speaking in generalities, an insanity defense is more likely

to be successful when the crime is senseless, heinous and shocking. In such situations a jury can more easily conclude that the defendant must not have understood the nature of his acts or that the same were wrong.

By contrast, for civil involuntary commitment purposes, a mentally ill person is defined by K.S.A. 1979 Supp. 59-2902(1) as follows:

"(1) The term 'mentally ill person' shall mean any person who is mentally impaired to .the extent that such person is in need of treatment and who is dangerous to himself or herself or others and

"(a) who lacks sufficient understanding or capacity to make responsible decisions with respect to his or her need for treatment, or

"(b) who refuses to seek treatment, except that no person who is being treated by prayer in the practice of the religion of any church which teaches reliance on spiritual means alone through prayer for healing shall be determined to be a mentally ill person unless substantial evidence is produced upon which the district court finds that the proposed patient is dangerous to himself or herself or others. Proof of a person's failure to meet his or her basic physical needs, to the extent that such failure threatens such person's life, shall be deemed as proof that such person is dangerous to himself or herself."

The sole purpose in the commencement of a civil involuntary commitment action is to attempt to force psychiatric treatment upon an unwilling person.

If the insanity defense is successfully asserted, then subsequent proceedings are governed by K.S.A. 1979 Supp. 22-3428 and 22-3428a. These statutes are crucial to understanding the procedures utilized relative to insanity acquittees and, although lengthy, must be set forth in toto:

"22-3428. Acquittal because of insanity; commitment to state security hospital; procedure for release; jury instruction. (1) When a person is acquitted on the ground that such person was insane at the time of the commission of the alleged crime the verdict shall be 'not guilty because of insanity,' and the person so acquitted shall be committed to the state security hospital for safekeeping and treatment.

"(2) Whenever it appears to the chief medical officer of the state security hospital that a person committed under this section is not dangerous to other patients, such officer may transfer such person to any state hospital. Any person committed under this section may be granted convalescent leave or discharge as an involuntary patient after thirty (30) days notice shall have been given to the district or county attorney, sheriff and district court of the county from which such person was committed.

"(3) Within fifteen (15) days after the receipt of the notice provided for in subsection (2), the district or county attorney may request that a hearing on the proposed leave or discharge be held. Upon receiving any such request the district

court shall order that a hearing be held on the proposed leave or discharge, giving notice thereof to the state hospital where the patient was transferred, and the court shall order the involuntary patient to undergo a mental evaluation by a person designated by the court. A copy of all orders of the court shall be sent to the involuntary patient and such patient's attorney. The report of the court ordered mental evaluation shall be given to the district or county attorney, the involuntary patient and such patient's attorney at least five days prior to the hearing. The hearing shall be held within thirty (30) days after the receipt by the court of the district or county attorney's request. The involuntary patient shall remain in the state hospital until the hearing on the proposed leave or discharge is to be held. At such hearing the court shall determine, and the patient shall have the burden of proof to show by a preponderance of the evidence, that the patient is not a danger to the patient's self or others. The patient shall have the right to present evidence at such hearing and to cross-examine any witnesses called by the district or county attorney. At the conclusion of the hearing, if the court finds that the patient continues to be a danger to the patient's self or others, the court shall order the patient to remain in the state hospital, otherwise the court shall order the patient discharged. If the court finds from evidence presented at the hearing that the discharge of the patient will not pose a danger only if the patient continues to take prescribed medication or to receive periodic psychiatric treatment or guidance counseling, then the court, if it orders the discharge of the patient, may order as a condition to the discharge that the patient continue to take prescribed medication and report as directed to a person licensed to practice medicine and surgery to determine whether or not the patient is taking such medication, or that the patient continue to receive periodic psychiatric treatment or guidance counseling. The court also may order that the patient be placed under the temporary supervision of a state probation and parole officer or district court probation or parole personnel, or any appropriate private agency, who will be authorized to prepare a suitable community re-entry program for the patient consistent with the recommendations, if any, of the person designated by the court to perform the mental evaluation. In order to insure the safety and welfare of the patient and the citizenry of the state the court may allow the patient to remain in custody at a facility under the supervision of the secretary of social and rehabilitation services for a period of time not to exceed thirty (30) days in order to permit sufficient time for said secretary to prepare recommendations to the court for a suitable re-entry program for the patient. Such re-entry program will be specifically designed to facilitate the return of the patient to the community as a functioning, self-supporting citizen, and may include appropriate supportive provisions for assistance in establishing residency, securing gainful employment, undergoing needed vocational rehabilitation, receiving marital and family counseling, and such other out-patient services that the designated agency identifies as beneficial. The jurisdiction of the court over the patient will terminate two years from the date of his or her conditional release and the supervisory authority over the patient then will expire unless earlier vacated by court order. In the event the patient will be residing in a county other than the county where the district court that ordered the conditional release is located, such court shall transfer venue of the case to the district court of such other county and send a copy of all of the court's records of the proceedings to such court. At any time during the conditional release period, the patient,

through his or her attorney, or the county or district attorney of the county in which the district court having venue is located may file a motion for modification of the conditions of discharge, and the court shall hold an evidentiary hearing on the motion within fifteen (15) days of its filing. The court shall give notice of the time for such hearing to the patient and the county or district attorney. If the court finds from the evidence at the hearing that the conditional provisions of discharge should be modified or vacated, it shall so order. If at any time during the transitional period the designated medical officer or supervisory personnel informs the court that the patient is not satisfactorily complying with the provisions of the conditional release, the court after a hearing for which notice thereof has been given to the county or district attorney and the patient, may make orders for additional conditions of the discharge designed to effect the ends of the re-entry program or the court may order the county or district attorney to file an application to determine whether the patient is a mentally ill person as provided in K.S.A. 1979 Supp. 59-2913. In cases where such an application is ordered to be filed, the court shall proceed to hear and determine the application pursuant to the provisions of the act for obtaining treatment for a mentally ill person and such provisions shall apply to all subsequent proceedings. The costs of all proceedings, the mental evaluation and the re-entry program authorized by this section shall be paid by the county from which such person was committed.

"(4) In any case where the defense of insanity is relied on the court shall instruct the jury on the substance of this section."

"22-3428a. **Annual hearings for persons found not guilty because of insanity; procedure.** (1) Any person found not guilty because of insanity who remains in the state security hospital or a state hospital for over one year pursuant to a commitment under K.S.A. 1979 Supp. 22-3428 shall be entitled annually to request a hearing to determine whether or not such person continues to be dangerous to the patient's self or others. The request shall be made in writing to the district court of the county where the person is hospitalized and shall be signed by the committed person or such person's counsel. When the request is filed, the court shall forthwith give notice of the request to: (a) The county or district attorney of the county in which the person was originally ordered committed, and (b) the chief medical officer of the state security hospital or state hospital where the person is committed. The chief medical officer receiving the notice or such officer's designee, shall conduct a mental examination of the person and shall send to the district court of the county where the person is hospitalized and to the county or district attorney of the county in which the person was originally ordered committed a report of such examination within twenty (20) days from the date upon which notice from the court was received. Within five (5) days after receiving the report of the examination pursuant to this subsection, the county or district attorney receiving the same may file a motion with the district court that gave the notice, requesting such court to change the venue of the hearing to the district court of the county in which the person was originally committed. Upon receipt of such motion and the report of the mental examination such court shall forthwith transfer the hearing to the district court specified in the motion and send a copy of the court's records of the proceedings to such court.

"(2) After the time in which a change of venue may be requested has elapsed the court having venue shall set a date for the hearing, giving notice thereof to the

county or district attorney of the county, the committed person and such person's counsel. If there is no counsel of record, the court shall appoint a counsel for the committed person. The committed person shall have the right to procure, at his or her own expense, a mental examination by a physician of his or her own choosing. If a committed person is financially unable to procure such an examination, the aid to indigent defendants provisions of article 45 of chapter 22 of the Kansas Statutes Annotated shall be applicable to such person. A committed person requesting a mental examination pursuant to K.S.A. 22-4508 may request a physician of his or her own choosing, whereupon the judge shall inquire as to the estimated cost therefor. If such physician agrees to accept compensation in an amount in accordance with the compensation standards set by the board of supervisors of panels to aid indigent defendants, the judge shall appoint the requested physician; otherwise, the court shall designate a physician to conduct the examination. Copies of each mental examination of the committed person shall be filed with the court at least five days prior to the hearing and copies thereof shall be supplied to the county or district attorney receiving notice pursuant to this section and the committed person's counsel.

"(3) At the hearing the committed person shall have the right to present evidence and cross-examine the witnesses. The committed person shall have the burden of proof to show by a preponderance of the evidence that the committed person is not a danger to such person's self or others. At such hearing the court may make any order that a court is empowered to make pursuant to subsection (3) of K.S.A. 1979 Supp. 22-3428, and any amendments thereto. If the court finds the committed person is no longer dangerous to such person's self or others, the court shall order the person discharged; otherwise, the person shall remain committed.

"(4) Costs of a hearing held pursuant to this section shall be assessed against and paid by the county in which the person was originally ordered committed."

The discharge and conditional discharge provisions of the above statutes were extensively discussed and construed in our recent decision of *In re Noel,* 226 Kan. 536, 601 P.2d 1152 (1979). The holdings in *Noel* were summarized in its Syl. ¶¶ 1-5 as follows:

"Under K.S.A. 1978 Supp. 22-3428a, the determination of whether an insanity acquittee continues to be dangerous to himself, herself or others is a legal rather than a medical decision. In such proceedings the court has the obligation to weigh all the evidence, including medical opinions, and reach an independent judgment. In any such determination, due consideration must be given to the protection of the public."

"Under K.S.A. 1978 Supp. 22-3428a, if the court finds the insanity acquittee is no longer dangerous to himself, herself or others, the court shall order the person discharged; if the court makes an unconditional finding that the insanity acquittee continues to be dangerous, the person shall remain committed; if the court finds the insanity acquittee will not pose a danger to himself, herself or others if certain conditions are imposed, the court may in its discretion order a conditional discharge pursuant to K.S.A. 1978 Supp. 22-3428(3)."

"In considering conditional discharge of an insanity acquittee pursuant to

K.S.A. 1978 Supp. 22-3428(3), a conditional finding that the patient does not pose a danger to himself, herself or others does not require the court to discharge the patient. To discharge or not to discharge is discretionary with the court."

"In exercising its discretion relative to any proposed conditional discharge of an insanity acquittee, the district court must consider whether any proposed conditions of discharge would truly accomplish their purpose; that is, to safeguard the patient and the public. If the court determines adequate safeguards are not present, then the patient should not be discharged. In any consideration of a reentry plan, the court should look to all aspects of the risks posed by the patient, the patient's condition, and examine every facet of the plan to determine if it will realistically accomplish its purpose. If the court is satisfied that conditional discharge is appropriate, it may order the conditional discharge in accordance with the statutory provisions of K.S.A. 1978 Supp. 22-3428(3)."

"In the district court's consideration of conditional discharge of the insanity acquittee, the determination as to dangerousness, whether discharge should or should not be ordered, and whether the conditional safeguards will accomplish their purpose, are all aspects of the same consideration and cannot be separately determined. If conditional discharge is ordered, the court should state with particularity the basis for its conclusion."

As stated in *Noel* at 556, the area of insanity acquittee discharge is a highly sensitive issue with the public. The present statutory scheme represents a legislative balance between the public's right to be protected from a potentially dangerous class of individuals and the rights of the members of the class to be protected from improvident confinement. A basic component of the statutory scheme is that every person successfully asserting an insanity defense shall receive an in-patient evaluation at the state security hospital prior to any transfer, discharge or conditional discharge. Significant responsibility is placed upon the chief medical officer of the state security hospital. The state security hospital is a unique and highly specialized state institution. It is the only state hospital providing substantial and ongoing security as a basic part of its program. Its chief medical officer and staff, presumably by virtue of training and experience, have expertise in evaluating and treating potentially dangerous persons. The legislature obviously relies heavily on the chief medical officer of the facility and has made such officer the integral part of the statutory scheme dealing with insanity acquittees.

The law presumes public officials will faithfully perform duties imposed upon them by law. *Bowers v. City of Kansas City,* 202 Kan. 268, 448 P.2d 6 (1968). Should the chief medical officer of the state security hospital fail to perform his duties, the additional safeguard of a habeas corpus action, pursuant to K.S.A. 60-1501 *et*

*seq.,* is available to the committed person whose rights are adversely affected thereby.

Does the mandatory commitment of insanity acquittees to the state security hospital, when viewed in context with the law of Kansas as it relates to the defense of insanity and post-commitment procedures, offend the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution? We think not.

Petitioner contends that were the precise questions presented here raised before the United States Supreme Court, he would prevail. In support of this contention, petitioner cites *Specht v. Patterson,* 386 U.S. 605, 18 L.Ed.2d 326, 87 S.Ct. 1209 (1967). Specht was convicted of a sex crime which carried a maximum sentence of 10 years. The trial court, pursuant to the Colorado Sex Offenders Act, had the petitioner examined by psychiatrists, received a report, granted the petitioner no hearing or right of confrontation, determined that the petitioner constituted a threat of bodily harm to members of the public or was a habitual offender and mentally ill, and sentenced the petitioner to an indeterminate term of from one day to life. The Supreme Court reversed on the rationale that, pursuant to said act, conviction of one crime was the basis for a new proceeding under the act. The new proceeding involved a new finding of fact. The petitioner could not participate in the new proceeding and was, accordingly, denied due process of law. This case is readily distinguishable from the case before us and needs no further discussion.

Petitioner also cites *Jackson v. Indiana,* 406 U.S. 715, 32 L.Ed.2d 435, 92 S.Ct. 1845 (1972), which invalidated an Indiana statute that authorized indeterminate committal of a person found incompetent to stand trial. In so doing, the court stated at 738:

"At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."

The factual situation in *Jackson* is readily distinguishable.

Another readily distinguishable case cited by petitioner is *Baxstrom v. Herold,* 383 U.S. 107, which struck down a New York law that permitted prisoners nearing the end of their terms to be administratively committed to mental hospitals. A similar situation was involved in the recent United States Supreme Court case

of *Vitek v. Jones,* 445 U.S. 481, 63 L.Ed.2d 552, 100 S. Ct. 1254 (1980).

A case providing much greater insight as to what the United States Supreme Court might do if confronted with the issues here, and highly pertinent to the determination herein, is *Lynch v. Overholser,* 369 U.S. 705, 8 L.Ed.2d 211, 82 S.Ct. 1063 (1962). Lynch was found not guilty by reason of insanity on bad check charges. The defendant did not raise insanity as a defense. In fact, he maintained he was mentally responsible and attempted to plead guilty. He was mandatorily committed to a mental hospital, pursuant to the District of Columbia Code. He challenged his commitment on constitutional grounds. The United States Supreme Court held that the mandatory commitment provision was inapplicable to Lynch since he had not asserted an insanity defense. The following section of the opinion is quite pertinent to the matter before us:

"The criminal defendant who chooses to claim that he was mentally irresponsible when his offense was committed is in quite a different position. It is true that he may avoid the ordinary criminal penalty merely by submitting enough evidence of an abnormal mental condition to raise a reasonable doubt of his responsibility at the time of committing the offense. Congress might have thought, however, that having successfully claimed insanity to avoid punishment, the accused should then bear the burden of proving that he is no longer subject to the same mental abnormality which produced his criminal acts. Alternatively, Congress might have considered it appropriate to provide compulsory commitment for those who successfully invoke an insanity defense in order to discourage false pleas of insanity. We need go no further here than to say that such differentiating considerations are pertinent to ascertaining the intended reach of this statutory provision.

"II.

"The enactment of § 24-301(d) in 1955 was the direct result of the change in the standard of criminal responsibility in the District of Columbia wrought by *Durham v. United States,* 94 U.S. App. D.C. 228, 214 F.2d 862. That decision provoked a congressional re-examination of the laws governing commitment of the criminally insane. 'Apprehension that *Durham* would result in a flood of acquittals by reason of insanity and fear that these defendants would be immediately set loose led to agitation for remedial legislation.' Krash, The Durham Rule and Judicial Administration of the Insanity Defense in the District of Columbia, 70 Yale L. J. 905, 941 (1961). A Committee on Mental Disorder as a Criminal Defense was established by the Council on Law Enforcement in the District of Columbia to inquire into 'the substantive and procedural law of the District of Columbia bearing on mental disorder as a defense in a criminal prosecution.' S. Rep. No. 1170, 84th Cong., 1st Sess. 1 (1955); H. R. Rep. No. 892, 84th Cong., 1st Sess. 1 (1955). Among its recommendations was a mandatory commitment provision, subsequently enacted as § 24-301(d). The Committee noted that while under

the then existing discretionary commitment statute it had been customary for the court and the appropriate executive official to order the confinement of all those who had been found not guilty solely by reason of insanity, more assurance should be given the public that those so acquitted would not be allowed to be at large until their recovery from past mental illness had been definitely established:

" 'No recent cases have come to the attention of this Committee where a person acquitted in the District of Columbia of a crime on the sole ground of insanity has not been committed to a mental hospital for treatment. Nevertheless, the Committee is of the opinion that the public is entitled to know that, in every case where a person has committed a crime as a result of a mental disease or defect, such person *shall* be given a period of hospitalization and treatment to guard against *imminent recurrence of some criminal act by that person.*' (Emphasis in the original.)

" 'The Committee believes that a mandatory commitment statute would add much to the public's peace of mind, and to the public safety, without impairing the rights of the accused. *Where accused has pleaded insanity·as a defense to a crime,* and the jury has found that the defendant was, in fact, insane at the time the crime was committed, it is just and reasonable in the Committee's opinion that the insanity, once established, should be presumed to continue and that the accused should automatically be confined for treatment until it can be shown that he has recovered.' S. Rep. No. 1170, 84th Cong., 1st Sess. 13 (1955); H.R. Rep. No. 892, 84th Cong., 1st Sess. 13 (1955). (Emphasis added.)

"It is significant to note that in finding that mandatory commitment would not result in 'impairing the rights of the accused' and that it was 'just and reasonable . . . that the insanity, once established, should be presumed to continue . . . until it can be shown that . . . [the accused] has recovered,' the Committee Report, which was embraced in the reports of the Senate and House committees on the bill, spoke entirely in terms of one who 'has pleaded insanity as a defense to a crime.' Certainly such confidence could hardly have been vouchsafed with respect to a defendant who, as in this case, had stoutly denied his mental incompetence at any time. And it is surely straining things to assume that any of the committees had in mind such cases as this, which are presumably rare." pp. 715-717.

One of the difficulties in comparing the decisions of courts of other jurisdictions is that each has its own statutory scheme and case law relative to the insanity defense. Even the test of insanity varies. Insanity acquittees in *M'Naghten* rule states have "failed" a far more rigid test than have insanity acquittees in an A.L.I. rule state. These differences are important relative to reasonableness of the mandatory commitment provision, as well as to its comparison with involuntary commitment procedures in considering equal protection arguments.

Annot., Commitment After Acquittal for Insanity, 50 A.L.R.3d 144, is directly on point. The annotation reflects that the majority of the states having the mandatory commitment of insanity ac-

quittees provision have upheld said statutes against constitutional challenges. Illustrative of the cases upholding such statutes is *State v. Kee,* 510 S.W.2d 477 (Mo. 1974), from our sister state of Missouri, wherein the court reviewed many of the cases cited by our petitioner and concluded that mandatory commitment does not deny due process, and that equal protection is not denied, although civilly committed persons are subject to different procedures.

In *Torsney (Mental Hygiene),* 47 N.Y.2d 667, 420 N.Y.S.2d 192 (1979), a case dealing with the later release of an insanity acquittee, the New York Court of Appeals again approved mandatory commitment of insanity acquittees, stating at 672:

"In recently sustaining the constitutionality of the automatic commitment of persons acquitted by reason of mental disease or defect, this court observed that '[a]n individual who has committed an act of violence, and has thus demonstrated his dangerousness, and who has successfully asserted an insanity defense, may quite properly be treated somewhat differently from other individuals who, although they may in fact be potentially equally dangerous as a result of mental problems, have not yet so vehemently demonstrated their dangerousness by violent antisocial behavior.' (*People ex rel. Henig v. Commissioner of Mental Hygiene,* 43 NY 2d 334, 338; see, also, *People v. Lally,* 19 NY 2d 27; *People ex rel. Peabody v. Chanler,* 133 App Div 159, affd 196 NY 525 [sustaining constitutionality of predecessor statutes to CPL 330.20].) For this reason, persons acquitted under CPL 330.20 may be viewed as an 'exceptional class' justifying commitment to the custody of the Commissioner of Mental Hygiene without a prior hearing to determine their mental condition on the date of acquittal."

See also *In the Matter of Lewis,* 403 A.2d 1115, 1118 (Del. 1979), approving the language in *Chase v. Kearns,* 278 A.2d 132, 138 (Me. 1971), as follows:

" '. . . [T]he finding by the jury that a defendant, because of his mental disease or defect, shall be held blameless for an act otherwise subject to criminal sanctions puts such a defendant into an exceptional class. The special interest which the public has acquired in the confinement and release of people in this exceptional class results from the fact that there has been a judicial determination that they have already endangered the public safety and their own as a result of their mental conditions as distinguished from people civilly committed because of only potential danger.' "

See also *Mills v. State,* 256 A.2d 752, 757 (Del. 1969), another Delaware case, wherein the court held:

"We hold that in adjusting the delicate balance between a society's right to be protected from potentially mental[ly] ill and dangerous individuals, on the one hand, and the individual's right to be protected from improvident confinement on the other, it was not a denial of due process to commit the appellant under § 4702

(a) by virtue of the presumption of continuing mental illness and the jury's verdict, without a separate hearing and determination as to present mental condition."

Petitioner cites cases wherein mandatory commitment provisions were invalidated. Illustrative of such cases is *Wilson v. State*, 259 Ind. 375, 385, 287 N.E.2d 875 (1972), wherein the Indiana Supreme Court reasoned:

"Having placed his former sanity in issue and having been acquitted by reason of insanity existing at the time of the crime charged, the defendant, quite logically, falls within the class of individuals possibly suffering from mental illness and within the subclass therein of those who may be dangerously mentally ill. The State, having enacted elaborate statutory safeguards to provide for the protection of society from people dangerously mentally ill, may not, consistent with the equal protection requirements as applied in *Baxstrom, supra,* and *Jackson, supra,* arbitrarily subject the defendant, as a person acquitted of crime by reason of insanity, to the substantially different procedures of Burns § 9-1704a and § 9-1705 and deny to him the protection and safeguards afforded others who may be equally insane and equally dangerous but concerning whom the possibility of such mental condition may have been differently manifested."

See also *State ex rel. Kovach v. Schubert,* 64 Wis. 2d 612, 623, 219 N.W.2d 341 (1974), wherein the Wisconsin Supreme Court held in a 4 to 3 decision that mandatory commitment was a denial of equal protection, inasmuch as civilly committed persons were subject to different procedures, and stated:

"We also conclude that the procedure under sec. 971.17, Stats., for the automatic commitment of a defendant upon a finding of not guilty by reason of mental disease or mental defect constitutes a denial of due process in its denial of a hearing and finding of present insanity at the time of the commitment.

"*Jackson v. Indiana* does not justify an automatic commitment without a hearing. That case merely holds that the duration of commitment must bear a reasonable relation to the purpose of the commitment. It does not stand for the proposition that commitment can be without a hearing. The petitioner in *Jackson* did have an adjudication of incompetency before being committed.

"To satisfy due process, the finding of present mental illness should be made after a full hearing on a defendant's present condition."

When the mandatory commitment of insanity acquittees is examined in context with the entire legislative scheme relative to the insanity defense, commitment, and discharge procedures, and the purpose of such legislation, we conclude:

1. The mandatory commitment is reasonably and rationally related to the accomplishment of proper legislative purpose, and is not arbitrary or capricious;

2. The legislative scheme constitutes a reasonable balance

between the public's right to be protected from a potentially dangerous class of individuals and the rights of the members of the class to be protected from improvident confinement;

3. The classification of insanity acquittees as a class separate and apart from persons subject to civil involuntary commitment procedures is not arbitrary or capricious and is reasonably related to proper legislative ends sought to be attained; and

4. The mandatory commitment of insanity acquittees does not deny due process of law nor equal protection of the law.

We also note the 1980 amendments to K.S.A. 22-3428 to be effective upon publication in the statute book. Although the case herein must be resolved upon the existing law, new K.S.A. 22-3428(1) provides:

"(1) When a person is acquitted on the ground that such person was insane at the time of the commission of the alleged crime the verdict shall be 'not guilty because of insanity,' and the person so acquitted shall be committed to the state security hospital for safekeeping and treatment. *A finding of not guilty by reason of insanity shall constitute a finding that the acquitted person committed an act constituting the offense charged or an act constituting a lesser included crime, except that the person did not possess the requisite criminal intent. A finding of not guilty because of insanity shall be prima facie evidence that the acquitted person is presently dangerous to the person's self or others or property of others.*" (Emphasis indicates amendment.)

This 1980 amendment is demonstrative of legislative intent and the result reached herein is not inconsistent therewith.

We turn now to the questions of whether under the particular facts of petitioner's situation, the mandatory commitment procedures are constitutionally defective on the grounds of due process and equal protection.

At this point the relevant facts are summarized as follows: The time period involved is roughly the first six months of 1976. Petitioner was, during said time, the president of both the Farmers State Bank in Canton, Kansas, and Sunflower Beef Feeders, Inc. Petitioner suffers from the mental illness known as manic-depressive illness. This illness is characterized by extreme personality shifts between the high-energy manic phase to the low-energy depressive phase. In the first half of 1976 petitioner was in the manic phase. He perceived himself as a financial genius in the futures market. His ability did not measure up to his perception thereof and serious financial losses resulted. Unfortunately, the losses included funds that were not his—hence, the bank embez-

zlement and theft charges herein. We do not have the record from the criminal cases. The State contends some $500,000 was concerned, but petitioner states the actual amount in the five counts was $100,000. In either event, a substantial sum of money was involved. When the situation was collapsing, petitioner had himself admitted to a Wichita hospital for psychiatric treatment.

Manic-depressive illness may be controlled by the continual taking of lithium carbonate in appropriate dosage. Petitioner has been receiving private psychiatric treatment, including the administration of lithium carbonate, during and since his two-week hospitalization. The expert psychiatric evidence submitted by stipulation to the trial court unanimously concluded that during the time period involved in the criminal acts charged petitioner was insane under the standards of the *M'Naghten* test of insanity.

The expert testimony proffered to the trial court in support of petitioner's motion to determine the applicability of the mandatory commitment provision of K.S.A. 22-3428 was to the effect that petitioner was voluntarily receiving psychiatric treatment, was taking the prescribed medication, said treatment was controlling his mental illness, and petitioner was currently functioning within the boundaries of normalcy and was not currently dangerous or in need of safekeeping or a treatment program in addition to what he was voluntarily receiving. Attached to the petition herein was the affidavit of a psychiatrist reiterating the above and expressing the opinion that petitioner's present treatment was superior to that which he would receive at the state security hospital, and that such hospitalization could be detrimental.

The petitioner contends that under the particular facts and circumstances of his situation his mandatory commitment is violative of the due process and equal protection clause of the United States Constitution. Boiled down to their very essence, these special circumstances are:

1. The nature of the offenses of which he was found not guilty because of insanity;

2. The fact he has not been in custody and has, while on bond, been evaluated and treated by well-qualified and highly respected private psychiatrists;

3. The psychiatric treatment already received and expected to be received in the future is superior to that available to him in state-maintained hospitals; and

4.   The psychiatric reports indicating his illness is being controlled by his present treatment program.

The United States Constitution does not afford greater due process and equal protection rights to:
1.   Persons involved in what is commonly referred to as white collar crime; or
2.   Persons who have the financial resources and opportunity to secure psychiatric treatment from well-credentialed private psychiatrists.

The petitioner has successfully asserted the defense of insanity. Mandatory commitment to the state security hospital is a part of the lawful procedure. The petitioner's contentions in this regard are without merit.

Inherent in K.S.A. 1979 Supp. 22-3428 is that upon commitment, the state security hospital should with all due speed evaluate the petitioner's present condition, needs, and propensity for dangerousness.

The extensive psychiatric treatment received by the petitioner should provide valuable data for the state security hospital in its evaluation of the petitioner.

As his final point, petitioner challenges his mandatory commitment on the ground that it constitutes cruel and unusual punishment. The purpose of K.S.A. 1979 Supp. 22-3428 is clearly not punishment. This point is without merit.

All matters raised by petitioner, whether or not specifically referred to herein, have been considered and found to be without merit.

The writ is denied.

HOLMES, J., dissenting.

I respectfully dissent. In my opinion the automatic incarceration of an insanity acquittee, as contemplated by the trial court and the majority of this court in their construction of K.S.A. 1979 Supp. 22-3428, violates both the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution.

The vital language of the statute provides in pertinent part:

"(1) When a person is acquitted on the ground that such person was insane at the time of the commission of the alleged crime the verdict shall be 'not guilty

because of insanity,' and *the person so acquitted shall be committed to the state security hospital for safekeeping and treatment."* (Emphasis added.)

K.S.A. 1979 Supp. 22-3428a(1) provides that any person lodged in the state security hospital may, after the expiration of one year and annually thereafter "request a hearing to determine whether or not such person continues to be dangerous to the patient's self or others."

It is obvious the intent of the statutes is to provide treatment, if necessary, for the acquitted defendant and protect such person and society from any violent or dangerous acts which he or she might be inclined to do because of mental illness.

The statute requires commitment for safekeeping and treatment. The corollary of this provision is that no commitment is required if the acquittee constitutes no danger to himself or others which would require "safekeeping" and if no "treatment" is required. To mandatorily place the acquittee in the state security hospital without a hearing to determine the need for safekeeping and/or treatment is violative of his constitutional rights under the Fourteenth Amendment.

In *Jackson v. Indiana,* 406 U.S. 715, 32 L.Ed.2d 435, 92 S.Ct. 1845 (1972), the Supreme Court held that the statutes of Indiana under which Jackson was indefinitely committed, based upon a determination that he was incompetent to stand trial, violated the equal protection and due process clauses of the constitution. Admittedly, the factual circumstances and statutes involved are quite different than those before this court. However, certain language and the holding of the court are persuasive, if not controlling.

". . . Jackson was not afforded any 'formal commitment proceedings addressed to [his] ability to function in society,' or to society's interest in his restraint, or to the State's ability to aid him in attaining competency through custodial care or compulsory treatment, the ostensible purpose of the commitment. *At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."* 406 U.S. at 738. (Emphasis added.)

The provisions of the statute, in my opinion, also violate the equal protection clause of the Constitution. Civil commitment under K.S.A. 59-2901 *et seq.,* requires stringent hearing requirements even though the person may be dangerous to himself or others. As stated by one commentator on Kansas criminal law:

"In Kansas a person is automatically committed after a finding of not guilty by reason of insanity. This raises a serious equal protection problem that should be considered by the legislature. . . . A person found not guilty by reason of insanity is automatically committed, but there is no specific finding that the defendant is presently dangerous. A hearing, however, is required for involuntary civil commitments, which squarely raises the equal protection problem." K. Meyer, *Survey of Kansas Law: Criminal Law and Procedure,* 27 Kan. L. Rev. 391, 402 (1979).

See also the equal protection portion of *Jackson v. Indiana,* 406 U.S. at 723.

In the case at bar, Jones faces the possibility, if not the probability, of spending over a year at the state security hospital without any prior determination that safekeeping and/or treatment are necessary and, under the majority's interpretation of the statute, without any procedure whereby he may demand a determination. Such a procedure bears no reasonable relationship to the ostensible objectives sought by the statute, that is, safekeeping and/or treatment. In fact where it has been shown, as in this case, that the acquittee requires neither safekeeping nor treatment by the state, such incarceration amounts to nothing more than punishment by way of confinement for the alleged commission of a crime of which the defendant has been acquitted.

In view of the amendment to K.S.A. 1979 Supp. 22-3428(1) by the 1980 Legislature (L. 1980, S.B. 536), it would serve no useful purpose to extend this dissent by further citation of authorities or argument. It is interesting to note, however, that the amendment provides in part: "A finding of not guilty because of insanity shall be *prima facie evidence* that the acquitted person is presently dangerous to the person's self or others or property of others." (Emphasis added.) Query: As "prima facie evidence" merely creates a presumption which may be overcome by evidence from the other party (in this statute, the insanity acquittee), does not the new amendment imply or contemplate a prior hearing to allow the *"prima facie evidence"* to be rebutted or contradicted? Black's Law Dictionary 1353-1354 (4th ed. rev. 1968). This is a determination which will probably be before this court at some later date.

In my opinion the writ of habeas corpus should issue.